INDEPENDENT SCHOOL DIST. et al. v. SALVATIERRA et al.

No. 8515.

Court of Civil Appeals of Texas. San Antonio.

Oct. 29, 1930.

Rehearing Denied Dec. 24, 1930.

Boggess, LaCrosse & Lowrey and Brian Montague, all of Del Rio, for appellants.

John L. Dodson, of Del Rio, M. C. Gonzales, of San Antonio, and J. T. Canales, of Brownsville, for appellees.

SMITH, J.

On January 7, 1930, the board of trustees of the independent school district embracing the city of Del Rio, ordered an election to be held within the district on February 1, 1930, to determine if the district should issue and sell its bonds in the sum of $185,000, "for the purpose of constructing and equipping public free school buildings of material other than wood and the purchase of the necessary sites therefor in said school district," and authorizing the levy and collection of taxes to pay off said bonds. At the ensuing election the proposition was adopted, and in due course the bonds were issued and sold. The validity of the election and of the issuance and sale of the bonds is not in question in this appeal.

The district owns, and its school buildings are located upon, a unit of land, oblong but irregular in shape, with an apparent approximate length of 1,200 feet. At the time the bond issue was voted there were four school buildings and a school athletic field upon this property, located as follows, from east to west: The high school, two elementary schools, the athletic field, and the third elementary school, designated the "Mexican" or "West End" school, consisting of two rooms. The program adopted by the trustees as a result of the bond issue provided for the construction of a new senior high school building, and remodeling and enlarging the elementary schools. The "West End" school, constructed of brick and tile, was to be enlarged by adding five rooms, including an auditorium of the same material.

It developed upon the trial that the West End building had been used for housing and teaching children exclusively of Spanish or Mexican descent who are in elementary grades up to and including the "low third." The district superintendent and one of the principals undertook in their testimony to explain the causes and purposes of this classification, or, as it amounts to, segregation. It was explained that as much as or more than half of those pupils go each autumn with their families to other localities where they engage in picking cotton or other farm work until the school terms are well advanced. Other pupils, entering at the beginning of the term, have thus progressed materially into the year's work, and it is the theory of the school authorities that the late comers will be handicapped in their morale and work if allocated with those having from one to four months' advantage over them in attendance, training, and progress. The su-

perintendent testified as follows in elaboration of this situation:

"Well we had a peculiar situation as regards people of Spanish or Mexican extraction here. We found a great percentage of those people are at work in cotton fields and on ranches, and some of them go entirely out of the district in the fall season, that is, return in the fall and enter school late and in considerable numbers, and where you have already organized your classes on a basis of a certain size which represents the most efficient instruction possible you are greatly hampered if a great number of people continue to drop in. The worst situation we have is in the first, second and third years, but it's bad all throughout the elementary grades. Classes normal in size at the beginning of the school year, because of that influx later in the season, become so large you can't manage them and of course they are retarded from the standpoint of enrollment, and there is a difference in ages in the same grades between children of Spanish or Mexican descent and those of Anglo-Saxon parentage. Partly for that reason and the language difficulty with which the overwhelming majority of children are hampered I directed that all the first three grades be set aside into the new two-room building and into the vocational agricultural building. I made that provision for the first three grades and organized on that basis.

"I was not actuated by any motive of segregation by reason of race or color in doing what I said I did. The whole proposition was from a standpoint of instruction and a fair opportunity of all children alike. That was the only consideration I had in the matter. There are decided peculiarities of children of Mexican or Spanish descent which can be better taken care of in those elementary grades by their being placed separately from the children of Anglo-Saxon parentage, because the average Spanish speaking children know English as a foreign tongue, and consequently when you put him in a class with English speaking children and teach him according to the method of teaching English speaking children he is greatly handicapped, and we have that handicap extending clear up into High School in all content subjects, such as English and History, and where they come along together in the same grade we find again and again the children are handicapped because they are slow in reading English and read it with difficulty, and as a consequence fail in considerable numbers in English and History. Now in mathematics they are very apt where the language difficulty does not obtain, and often make more progress than the American children. In other words, the child of Spanish or Mexican extraction in Mathematics is liable to progress more rapidly than the children of American extraction, age being the same he will progress about the same degree; but the situation we have here is different, and that brings another aspect into the question. The truth is that most of these Spanish speaking children, by reason of the fact that they attend school only a part of the year, are more greatly retarded, and I find from a check up we made again just yesterday that the difference in age in the given grade between the Anglo-Saxon child and the Spanish or Mexican child is anywhere from two to four years."

The superintendent further testified:

"Yes, I have stated that I placed the first three grades of Mexican children over in this two room building that was completed during the summer. My purpose in doing that was simply to instruct that group according to their own peculiar needs. To develop a curriculum in English that would enable them to cope in competition on equal terms with children in higher grades when they reached those classes. I never thought of denying any child or children in those elementary grades now being schooled in the two room building, or do I contemplate denying to them any educational advantages or facilities which are accorded to the children of Anglo Saxon extraction. No, indeed, I don't contemplate denying them any such privilege. As a matter of fact that is the best equipped and most pleasant elementary school situation we have. No, I wouldn't say those children are being given privileges or advantages which the children of Anglo-Saxon extraction are not being given, but they are better housed than any we have in the same grades; and we have competent teachers for that peculiar class of students. By reason of their being there and by reason of their having teachers of that character, I think they have better opportunities because of the fact that their teachers are specialized in the matter of teaching them English and American citizenship. It's my plan not only to do that but to develop certain other talents they have. I have noticed that the Spanish speaking children are unusually gifted in music, above the American children, and I believe that phase of their talents ought to be developed, and I so stated to the Parent-Teachers Association of the Latin-American Association. And if our plan of operation is unhampered we contemplate giving them facilities for development of this musical talent.; and in art, on an average, I find they are superior to the American child in this talent, and I believe their work should include art and a good deal of handicraft work at the first grade. By nature I feel they are endowed with special facilities for this work. I want to develop that art talent just as fast as we can get a faculty that can carry on. * * *

"Yes, I testified a while ago relative to some of the Mexicans going off to the cotton

fields and the other places and coming in late and attending only part of the year, and presumably that was one reason why I wished to make separate provision for them. Yes, there are other children, American English speaking children who come in late, but a very small per cent of them. No, I did not send any of those English speaking children who came in late over to the school where I sent the Mexican or Spanish speaking children, because there were so few there was nothing to worry about with them. I only sent the Spanish speaking children over there, those who came in late. Yes, it's true, generally the best way to learn a language is to be associated with the people who speak that language. * * *

"My observation as to the association is that it does not have the value on the play ground generally attributed to it. While it is true that the children mingle to a certain extent on the play ground, yet there is a tendency on the part of both groups to stay to themselves and to speak their language to each other. I have observed that all along from the first grade and on through the high school, you see them gather up into little groups. On the other hand when it comes to teaching the child, if you teach a child in English and devise a special curriculum to meet his needs from the fact that he is of another language you will accomplish far more than on the play ground with the sort of social intermingling that takes place there. Yes, as a matter of fact the boy on the play ground would naturally be interested in the games they were playing, and to some extent they would naturally be thrown together in the playing of those games. Yes, for the purpose of playing those games it would seem that it would be incumbent upon Spanish speaking children to learn English in order to participate in the games.

"And that could not be accomplished by an act of segregation then where they spoke their mother tongue, could it?

"My view is the other method of teaching will give a better method of the language because the child is required to use it constantly, and he is checked up by an American teacher with a view to removing all trace of accent, and he is forced continually throughout the day to speak it.

"No, that would not be prohibited in the schools, and if the children's language needs were the same as the language needs of all children in the room it would work out well, but the needs are different, and consequently I find it advisable to devote twice as much time to teaching English to the Spanish speaking child in the first three grades in order to develop in him the necessary facilities and use of the language so that he can cope on equal terms with American language. So far as mentality is concerned there is no per-

ceptible difference in the mentality of children of Spanish or Mexican descent and those of children of Anglo-Saxon parentage, but there is a little difference in temperament and a difference in certain talents. But when it comes to mentality, which I said a while ago, that is if children in a certain grade are much more mature in years than the average of children in that grade their mentality will be different, and consequently they will need a different method of instruction. This illustrates that point. You take a child of Anglo-Saxon parentage and a child of Latin-American parentage, say in about the fifth grade, and put them in a class room together to study English, the American child just takes the history away from the Latin-American child, and the Mexican child will sit back for the most part dumb and helpless. Where they take it away from the child they take it in English, but we are required to teach in English. In a subject like mathematics the average Mexican child is more mature in age and more readily learns mathematics, but in that situation we have such an age difference the Latin-American child takes the whole thing away from the American child and he is handicapped. I have been told that it is true that a Mexican child will reach the puberty stage sooner than an American child, and that people originating in torrid climates will mature earlier; its owing to the climatic conditions."

It is apparent from the record that, unless prevented by this litigation, the school authorities will continue this segregation in the West End building as now constructed and extend it to the proposed enlarged structure when it shall be completed and equipped. It should be added that this segregation or classification is restricted to the lower grades, and does not extend to higher grades, where all the scholastics mingle in play and work indiscriminately, in the same rooms and on the same playgrounds. The complaint of appellees seems to relate only to the segregation of those pupils who were allocated to the West End building and thereby excluded from other buildings or rooms in which children of other races are taught corresponding grades.

At the instance of Jesus Salvatierra and several other individual taxpaying patrons of the school district, the trial court granted an injunction restraining the district and school superintendent, quoting from appellants' brief, "(a) from letting or entering into any contract for the construction or erection of the addition to said two room building, which when completed, would be used as a means for the purpose of segregating the children of plaintiffs and others similarly situated, from children of Anglo-Saxon parentage of like ages and educational attainments, and (b) from segregating the children of plaintiffs and others similarly situated from children

of Anglo-Saxon parentage of like ages and educational attainments within the school district."

The litigation rests upon appellees' contention that the acts and conduct of appellants are designed to effect, and do actually accomplish, the complete segregation of the school children of Mexican and Spanish descent (in certain elementary grades) from the school children of all other white races in the same grades, thereby excluding the one from the classrooms of the other, and denying to them the right and privilege of mingling with those of the other races in the common enjoyment of identical school facilities, instruction, associations, and environment. There seems to be no contention—at least no such contention is sustained by the record—that the Mexican children are not given facilities equal in comfort and convenience, and instruction equal in efficiency, to the facilities and instruction given all other races. The complaint seems to be restricted solely to the charge that all scholastics of Spanish and Mexican descent are not allocated indiscriminately, without reference to race, with all other scholastics in corresponding grades; in short, that a separate school is being maintained exclusively for Mexican children in the three grades mentioned.

The problem presented in the Del Rio schools is one peculiar to that section of Texas bordering upon the republic of Mexico. Naturally, and in fact, the population of this section is in many communities and counties largely of Spanish and Mexican descent, who may be designated, for convenience of expression in this opinion, as the Mexican race, as distinguished, for like convenience, from all other white races. In some communities the former predominate, in others the latter; in many, as in Del Rio, the two are approximately evenly divided as to numbers. It is to the credit of both races that, notwithstanding widely diverse racial characteristics, they dwell together in friendship, peace, and unity, and work amicably together for the common good and a common country. Racial dissensions, if any occur, are so rare and slight as to escape public notice, and we look in vain into the law books for evidences of such dissensions. It is a matter of pride and gratification in our great public educational system and its administration that the question of race segregation, as between Mexicans and other white races, has not heretofore found its way into the courts of the state, and therefore the decision of no Texas court is available in the disposition of the precise question presented here. And, while the courts will not hesitate in any proper proceeding to protect the races in the enforcement of their common rights and privileges, they will nevertheless carefully avoid improvident interference with the local governmental agencies upon whom rest the immediate power and duty to promote and preserve peaceful and friendly relations between all races in the several communities.

It should be perfectly obvious that where, as at Del Rio, the races are approximately evenly divided in numbers, the classification and allocation of the scholastics of both races through the public elementary and grade schools sometimes present difficult and delicate problems, calling for the exercise of justice and equality towards all races, no less than the sure application of pedagogical wisdom and experience. In each such locality specific methods and rules, or the application thereof, may differ because of peculiar conditions, but in none of them should this liberty of discretion or administration be exercised in derogation of the letter or spirit of the constitutional or statutory rights, privileges, or immunities of the citizen or his children, of whatever race; or, in short, to effectuate an arbitrary segregation of the races, or unjust discrimination against any race or the individual members thereof.

■■ It cannot be gainsaid that under familiar constitutional and statutory provisions the local school boards of this state have the power to manage and regulate the schools of their respective districts, to administer the affairs of those schools in such manner as in their judgment may most certainly accomplish the wholesome objects of our public educational policies. This discretion extends to the power to locate and construct the district schools upon such sites, and in accordance with such plans and specifications, as in their judgment seem best suited to the purposes of those policies.

So is it the peculiar duty and prerogative of school authorities to so plan the methods of instruction and so classify and group the pupils as to bring to each one the greatest benefits according to his or her individual needs and aptitudes. This is of the very essence of the science of teaching. In that field those in whom these duties are inherent have, of necessity, the widest discretion, with which neither the courts nor any other department of government may interfere, so long as those acts are lawful, or that discretion not clearly abused. It may also be said that in the performance of these intricate and delicate duties it is inevitable that cases will arise, as incidents, in which the sensibilities of given pupils or their parents will become ruffled over acts of fancied or even real discrimination. Such incidents will not warrant the courts in enjoining or destroying the system, but, if for any reason the patrons are dissatisfied with the determination of any of these matters which are purely administrative, they may complain thereat to the local board, and, if overruled, to the county superintendent, whose decision may be questioned only through the specific channels prescribed

by statute. Articles 2690, R. S. 1925, 2686, as amended by the Acts of 1927, 40th Leg. (chapter 83, § 1, p. 128 [Vernon's Ann. Civ. St. Art. 2686]).

■■ It is only when the school authorities go clearly beyond their administrative powers that the courts may directly interfere. It is a prerogative of the courts to determine in a proper proceeding what those powers are, and whether or not those authorities have exceeded them. If by this process it is determined that the school authorities have transgressed those powers, the courts will in a proper proceeding condemn and enjoin the actions. But, on the other hand, if it appears that those authorities are but exercising the discretion incident to those powers, those complaining will be relegated to the remedy prescribed in the statutes cited. Bishop v. School Dist. (Tex. Com. App.) 29 S.W.(2d) 312; Adams v. Miles (Tex. Civ. App.) 300 S. W. 211, and authorities there cited.

■ In this case the school board, through its superintendent, has effectuated, and intends in the future to continue, the segregation of the Mexican children in the first, second, and third grades, giving therefor the reasons set out at length in the testimony of the superintendent. This court cannot say that either reason given by 'the superintendent for the segregation complained of is unreasonable, if impartially applied to all pupils alike, or that it does not evince a careful study of the practical problem confronting him, or a sincere effort to solve that problem in such manner as to secure the greatest benefits to the school children of the district. To the extent that the plan adopted is applied in good faith as to those brought within the projected classification, with no intent or effect to discriminate against any of the races involved, it cannot be said that the plan is unlawful or violative even of the spirit of the constitution. And whatever may be the effects or incidents of the general plan as working an unlawful discrimination in any given case, the courts cannot be justified, by reason thereof, in condemning the whole plan, nor may they lay down arbitrary tests and rules by which it must be operated so as to prevent such discriminations. We may go no further than to enjoin acts of unlawful discrimination in specific cases when such acts are proven in a proceeding brought by those having a legal right to maintain the action.

■■ In this case this court can say no more than that the school authorities have no power to arbitrarily segregate Mexican children, assign them to separate schools, and exclude them from schools maintained for children of other white races, merely or solely because they are Mexicans. An unlawful discrimination will be effectuated if the rules for the separation are arbitrary and are applied indiscriminately to all Mexican pupils in those grades without apparent regard to their individual aptitudes or attainments, while relieving children of other white races from the operation of the rule, even though some of them, as for instance those who tardily enter the terms, may be subject to the classification given the Mexican children. To the extent that the classification is arbitrarily imposed upon those of one race, but relaxed in its application to those of the other races so as to exclude the latter from its operation, it constitutes an unlawful racial discrimination.

■ These conclusions bring us back to the question of remedy. No court may lay down a set of rules by which the school board and faculty shall grade, classify, and assign the pupils, for such are purely administrative functions inherent in the local school authorities and wholly foreign to the prerogatives of the judiciary. Those rules, by whatever authority promulgated, must be more or less flexible and adjustable to the peculiar needs of each school, grade, and class, as well as to the instructional needs of the individual pupils. Only the school authorities there on the ground as each pupil is presented for admission, may properly, reasonably, justly, or effectively grade, classify and assign the applicants.

In this case the record shows only two specific instances where it is claimed Mexican children were entitled to, but were denied, entry into classrooms other than those to which they had been assigned—those incidents occurred at a former term, are closed, and the school authorities, denying knowledge thereof, or responsibility therefor, negative any intention or purpose of permitting a repetition of them. So there is nothing before this court—there was nothing before the trial court—except the general complaint that the Mexican children of the first, second, and third grades are being unlawfully segregated into a separate school and excluded from other schools in which other white children are taught in the same grades. There is no attempt to show that any particular individuals or groups among those children were or are or will become eligible or entitled to admission into other schools or rooms, or that they will be denied such admission upon their qualification therefor, or that children of other races housed in other schools or rooms should be assigned to the West End school; or that they will not be so assigned if and when they become eligible therefor. The school board has made no order, general or specific, touching the matter in controversy, and, so far as the record shows, have no such order in contemplation. Such matters of administration as grading, classification, and assignment of pupils have been intrusted, as would be expected, to the superintendent, subject to veto by the board, although so far the board, fully cognizant of the policy and acts

of the superintendent in these matters, has acquiesced therein with full approval of those acts and that policy. It is obvious, for that matter, that the board could make no rational arbitrary rule or order governing that policy in detail, any more than a court could do so, by injunction or otherwise.

■ The function of the courts extends no deeper into such administrative affairs than to prevent the school authorities from exceeding their powers so as to work a forfeiture of the private rights, immunities, and privileges of the citizens or their children, and this function may be invoked by individuals against only specific, tangible acts resulting, or threatening to result, in injury and damage. peculiar to the suitor, as distinguished from a public wrong such as that complained of here. "We think it a principle established by the overwhelming weight of authority in the courts of all countries subject to the common law that no action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself. * * * 2 Cooley, Bl. 219. For a special damage resulting from the invasion of a right enjoyed by a party in common with the public, the law affords him a remedy by private action, but if the damages he suffers are only such as are common to all, the action must be brought by the lawfully constituted guardian or guardians of the public interest." City of San Antonio v. Strumberg, 70 Tex. 366, 7 S. W. 754, 755; Hughes v. Dubbs, 84 Tex. 505, 19 S.W. 684, 686; Caruthers v. Harnett, 67 Tex. 127, 2 S. W. 523; Lewright v. Love, 95 Tex. 160, 65 S. W. 1089, 1090. Since it is not shown in this case that the school authorities are at this time enforcing unlawful segregation against any particular child or children, or intends to do so, or that the individual complainants are suffering or threatened with injury and damage peculiar to themselves, no right of action is open to them, at least in so far as they complain of the alleged policy of the school authorities in so classifying the scholastics as to effect an unlawful segregation of the children of the Mexican race generally.

■ It is urged by appellees, comprising a group of individuals, that any taxpaying citizen may seek injunctive relief against the unlawful expenditure of public funds by a governmental body, and this may be true. By this process they seek in this action to restrain the school board from contracting for the addition of five rooms to the West End School building and from pledging any of the proceeds of the bond issue for such purpose. But, as has been held in this opinion, the matter of locating and constructing school buildings is an administrative function of the board, and may not be questioned except in the manner and by the processes prescribed by the statutes, as already pointed out; and, where the board has exercised its discretion in such matters, its action thereon is final and conclusive, at least as against an attack by the process here invoked.

■ So is it claimed that the board intends to put the proposed structure to the unlawful use of inhibited race segregation. Appellants deny this, and it will not be presumed, for the purpose of restraining them against the threatened action, that they as public officials will violate the law, exceed their powers, and divert the public facilities to unlawful uses and purposes. If and when they do so, the courts will restrain them in a proper proceeding invoked by appropriate authority.

The judgment is reversed and the injunction dissolved, at the cost of appellees.