**UNITED STATES of America**

v.

**STATE OF TEXAS et al.**

**Civ. A. No. 5281.**

United States District Court,
E. D. Texas,
Tyler Division.
Dec. 6, 1971.

Roby Hadden, U. S. Atty., Tyler, Tex., Brian K. Lansberg, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

Grant Cook, Houston, Tex., James McCoy, Asst. Atty. Gen., Austin, Tex., for defendants.

J. B. Ochoa, Jr., El Paso, Tex., Mike Gonsalez, Del Rio, Tex., Warren Burnett, Odessa, Tex., amici curiae.

MEMORANDUM OPINION REGARDING THE SAN FELIPE DEL RIO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

JUSTICE, District Judge.

The final order in this case with respect to the creation and desegregation of the San Felipe Del Rio Consolidated Independent School District and its operation as a unitary system which would afford all its students, whether Anglo or Mexican-American, equal educational opportunities as guaranteed by the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, was entered on August 13, 1971. That order and the Court's previous decree in this matter dated August 13, 1971, was premised upon the Court's firm conviction that the record demonstrates, first, that Mexican-American students in the State of Texas are a cognizable ethnic group and, hence, may avail themselves of the protections afforded under the Fourteenth Amendment and under Title VI (See Conclusions of Law #5 and 6 entered August 24, 1971) and, second, that the Mexican-American students in the Del Rio area have been subjected, over the years, to unequal treatment with respect to the educational opportunities afforded them and are, thus, part of a so-called *de jure* dual school system based upon separation of students of different ethnic origins. Moreover, the Court believes that this segregated arrange-

ment, if not directly created by the State and its agencies, has been condoned and, in the 1970–71 school year, was financially supported by the State to a level well over 90% of the operating expenditures of each of the two school districts joined by the August 13 order. In other words, had it not been for the substantial contributions of the State under the terms of the Texas Minimum Foundation Program and under various additional arrangements, neither the former San Felipe nor the former Del Rio school district could have continued in operation. Hence, since the State and its agencies knew, or should have known of the segregated educational system being operated, largely at state expense, in the Del Rio area, and in light of this Court's previous findings of fact and conclusions of law concerning the State of Texas and the Texas Education Agency in this case (See Findings and Conclusions dated November 21, 1970), this Court believes that the segregated system described above existed as the result of state action.

The Court believes that the order of August 13 relating to consolidation and desegregation of the students and faculty of the two former districts in the Del Rio area is clear on its face and, therefore, finds it unnecessary to comment further upon it, save to say that it is consistent with the earlier orders of the Court in this case dated November 24, 1970, 321 F.Supp. 1043, April 19, 1971, and April 20, 1971, as modified July 13, 1971, and so approved by the Court of Appeals for the Fifth Circuit, 447 F.2d 441. In light of the relative novelty of the issue in current case law, however, the Court considers it advisable to clarify its position regarding the status of Mexican-American students within the State of Texas as developed from existing case law and from the record in this matter.

The Court found that "Mexican-Americans constitute an identifiable mi-

nority group in the State of Texas," and that "Mexican-Americans are subject to protection under Title 6 of the Civil Rights Act of 1964 and the Fourteenth Amendment as applied to racial and ethnic discrimination in public schools." As stated in a scholarly note by Gerald M. Birnberg in the University of Texas Law Review, 49 Texas L.Rev. 337, 338 (1971), "The conclusion that ethnic isolation of Mexican-Americans in the public schools is unlawful should not be surprising, since that principle has long been established in Texas law." Independent School District v. Salvatierra, 33 S.W.2d 790 (Tex.Civ.App.1930), appeal dismissed, w. o. j., and cert. denied, 284 U.S. 580, 52 S.Ct. 28, 76 L.Ed. 503 (1931); Delgado v. Bastrop Independent School District, Civ. No. 388 (W.D.Tex. June 15, 1948); Hernandez v. Driscoll Consolidated Independent School District, 2 Race Rel.L.Rev. 329 (S.D.Tex. January 11, 1957). (See also, Instructions of the State Superintendent of Public Instruction, (1948) sent to school districts by the State Education Agency to inform them that segregation of Mexican-American students constituted a violation of Article VII, Section 7, of the Texas Constitution, Vernon's Ann. St.) [1] This same principle has also been upheld by other federal courts. Perez v. Sonora Independent School District, C.A. 6–224 (N.D.Tex.1969); Cisneros v. Corpus Christi Independent School District, 324 F.Supp. 599 (S.D.Tex.1970), on appeal, C.A. (5th Cir. 1971). Judge Seals stated in *Cisneros:*

. . . . [I]t is clear to this court that these people for whom we have used the word Mexican-Americans to describe their class, group, or segment of our population, are an identifiable ethnic-minority in the United States, and especially so in the Southwest [and] in Texas. . . . [f. n. s. omitted] This is not surprising; we can notice and identify their physical characteristics, their language, their predominant religion, their dis-

---

[1] Art. VII, Section 7, states:
"Separate schools shall be provided for

the white and colored children, and impartial provision shall be made for both."

tinct culture, and, of course, their Spanish surnames. And if there were any doubt in this court's mind, this court could take notice, which it does, of the congressional enactments, governmental studies and commissions on this problem. [At pages 607, 608]

Judge Seals also noted in the *Cisneros* opinion that the identity of Mexican-Americans or Americans with Spanish surnames as a cognizable group is further acknowledged in the official United States Census for 1960 and 1970. (*Cisneros*, fn. 31 at page 607).

■ This Court joins Judge Seals and the other courts cited above in the position that, based on case law to date and on the official state and federal documents available and already noted and on the record in the matter at bar, Mexican-Americans or Spanish-surnamed Americans are a separate and distinct national origin group under the terms of Title VI of the Civil Rights Act of 1964 and within the meaning of the Fourteenth Amendment.

The Court was particularly impressed by the testimony of Dr. Jose Cardenas, who presented a lengthy commentary on the problems commonly faced by Mexican-American students. This testimony demonstrated that Mexican-American students exhibit numerous characteristics which have a causal connection with their general inability to benefit from an educational program designed primarily to meet the needs of so-called Anglo-Americans. These characteristics include "cultural incompatibilities" and English language deficiencies—two traits which immediately and effectively identify those students sharing them as members of a definite group whose performance norm habitually will fall below that of Anglo-American students who do not exhibit these traits. It would appear, therefore, from Dr. Cardenas's testimony, that it is largly these ethnically-linked traits—albeit combined with other factors such as poverty, malnutrition and the effects of past educational deprivation—which account for the identifiability of Mexican-American students as a group and which have, as a consequence, elicited from many school boards throughout Texas and, indeed, throughout the southwestern United States, the different and often discriminatory treatment shown on the record in this case.

This court is convinced that the characteristics of Mexican-American students bind them into a cognizable "national origin" group and has, in the case at bar, ruled accordingly. If it may be argued in such factual circumstances that the nature of the Mexican-American heritage is too vague and elusive a ground upon which to base a belief that the people sharing that heritage are an identifiable ethnic entity [see Tijerina v. Henry, 48 F.R.D. 274 (D.N.M.1969), appeal dismissed, 398 U.S. 922, 90 S.Ct. 1718, 26 L.Ed.2d 86 (1970) (but cf. dissent by Douglas, J.)], nevertheless, the Mexican-American students in this case may be considered as a separate and distinct group cognizable under the Fourteenth Amendment and Rule 23 of the Federal Rules of Civil Procedure. This position may be justified solely on the grounds that these students react to or are affected by a given stimulus—the Anglo-oriented educational program such as that maintained in the former Del Rio Independent School District—in a similar and predictable manner and, in the opinion of a recognized expert, this reaction is based almost entirely on common characteristics which, incidentally, may be traced to their common and distinct ancestry. See cases cited in Carpenter v. Davis, 424 F.2d 257, at 260 (5th Cir. 1970).

It may be well to note that for many years, Mexican-Americans have been recognized by the Supreme Court as an ethnic group which may sustain discriminatory treatment as a class. Significantly, in the opinion in Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1945) [2] (a case decided just

---

2. *Hernandez* was a jury selection case originating in Jackson County, Texas, which is approximately 15% Mexican-American and which has on the tax rolls freehold-

two weeks before the famous Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and also written for a unanimous Court by Chief Justice Warren), it was held that

The State of Texas would have us hold that there are only two classes—white and Negro—within the contemplation of the Fourteenth Amendment. The decisions of this Court do not support that view.[4] And, except where the

4. See Truax v. Raich, 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131]; Takahashi v. Fish & Game Commission, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478]; Cf. Hirabayashi v. United States, 320 U.S. 81, 100 [63 S.Ct. 1375, 1385, 87 L.Ed. 1774]: "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."

question presented involves the exclusion of persons of Mexican descent from juries, [fn. omitted] Texas courts have taken a broader view of the scope of the equal protection clause.[6] Throughout our history dif-

6. In Juarez v. State, 102 Tex.Cr.R. 297, 277 S.W. 1091, the Texas court held that the systematic exclusion of Roman Catholics from juries was barred by the Fourteenth Amendment. In Clifton v. Puente [Tex.Civ.App.] 218 S.W. 2d 272, the Texas court ruled that restrictive covenants prohibiting the sale of land to persons of Mexican descent were unenforceable.

ferences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further

ers, about six or seven percent of whom were of Mexican descent. The State stipulated that no Mexican- or Latin-named person had served on a jury commission, or a grand or petit jury in Jackson

shown that the laws, as written or as applied, single out that class for different treatment not based on, some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a "two-class" theory—that is, based upon differences between "white" and Negro.

Having determined that the Mexican-American students in the San Felipe Del Rio area may be and, indeed, for current educational purposes, must be considered as members of a cognizable ethnic or national origin group, the relief in this case becomes fundamentally similar to that which has been framed in school desegregation suits before this Court based on discriminatory treatment of black students. The mandate, as directed by the Supreme Court, is to "eliminate discrimination root and branch," Green v. New Kent County Board of Education, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and to create a unitary school system "with no black [Mexican] schools and no white schools but just schools."

Just what is a unitary school system? The Supreme Court has offered as yet little explanation beyond saying that in such a system, no child will be effectively denied equal educational opportunities, Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and that the system shall exhibit the greatest amount of actual desegregation possible. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).

■ Although these phrases are general and were made in the context of

County for the twenty-five years immediately preceding the action. It was in this context that the Court found sufficient support for its explanation of classes covered by the Fourteenth Amendment.

black/white desegregation, this Court finds them to be useful guidelines in this case. Under the circumstances here, as elucidated by Dr. Thomas and Dr. Cardenas, both experts in the problems of Mexican-American students in traditionally Anglo-American school environments, little could be more clear to the Court than the need in the newly consolidated school district created as a result of this Court's earlier order for special educational consideration to be given to the Mexican-American students in assisting them in adjusting to those parts of their new school environment which present a cultural and linguistic shock. Equally clear, however, is the need to avoid the creation of a stigma of inferiority akin to the "badges and indicia of slavery" spoken of in United States v. Jefferson County Board of Education, 372 F.2d 836 (5 Cir., 1966), cert. denied sub nom. United States v. Caddo Parish Board of Education, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). To avoid this result the Anglo-American students too must be called upon to adjust to their Mexican-American classmates, and to learn to understand and appreciate their different linguistic and cultural attributes. The process by which all students participate in a joint learning and adjustment process will not only constitute an educational enrichment but, also, will bring the school system as a whole closer to that goal or state-of-being referred to by the Supreme Court as a "unitary system." It is with this goal in mind, therefore—that of true integration as opposed to mere desegregation or, as Texas news media are wont to term it, "racial mixing"—that the Court issued its major order in the case of the San Felipe Del Rio Consolidated Independent School District.

## A COMPREHENSIVE EDUCATIONAL PLAN FOR THE SAN FELIPE DEL RIO CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

I. On August 13, 1971, this Court entered an order pursuant to United States v. Texas, 321 F.Supp. 1043 (E.D.Tex. 1971), requiring the development and submission to the Court of a comprehensive educational plan containing sufficient educational safeguards to insure that all students in the San Felipe Del Rio Consolidated Independent School District will be offered equal educational opportunities. By order of the Court, these "safeguards" were to "include but . . . not necessarily be limited to bilingual and bicultural programs, faculty recruitment and training and curriculum design and content."

Subsequently the School Board of San Felipe Del Rio Consolidated Independent School District appealed to the Court of Appeals for the Fifth Circuit, complaining particularly of that portion of this court's order relating to bilingual and bicultural educational programs, and also contesting the venue of this civil action. Thereafter, the appellant school board and the Department of Justice informed the Court of Appeals that they had agreed upon a new comprehensive plan. Such parties jointly moved the court to remand this civil action to the trial court, in order to give it an opportunity to pass upon the agreed plan. On November 3, 1971, the Court of Appeals remanded this cause to this court "for further proceedings".

At the hearing before this court on November 26, 1971, it was revealed that none of the members of the school board of the former San Felipe Independent School District had been notified of or had participated in the negotiations between the school board of the newly consolidated district and the Department of Justice, although four members of the former San Felipe Board were made members of the interim board of the newly consolidated school district by order of this court previously entered. Likewise, none of the attorneys representing the Amici Curiae were notified of or participated in these negotiations. The evidence adduced at the most recent hearing in this court also revealed that efforts to obtain federal funds to implement the Comprehensive Educational Plan, provided for in this court's order

of August 13, 1971, have been extremely tentative, desultory and ineffective.

Considering the acknowledged sophistication of the appellant school board's present attorneys in this field of litigation, considering the professional qualifications and expertise of the school administration, particularly the superintendent, and also considering the undisguised hostility of the members of the interim board who were members of the board of the former Del Rio Independent School District to this court's plan relating to bilingual and bicultural educational program, the court is of the opinion that the school district has made no sincere or good faith effort to obtain federal funding of the Comprehensive Educational Plan ordered by this court.

Also, it should be noted that, although this court was led to believe that practically unlimited federal resources for the implementation of this plan were available in the form of discretionary funds available to the Secretary of Health, Education and Welfare, and that the Secretary vigorously supported such a plan, only a modicum of the funds required has been advanced by the Department of Health, Education and Welfare to this date. In this connection, it is further noted that the Department of Justice has apparently made no effort whatever to assist the school district in the obtaining of such funds, although this court adopted the plan urged by the Department of Justice.

It is obvious that the plan adopted by this court can not be implemented unless a sincere and good faith effort is made jointly by the school board and the Department of Justice to obtain such funds and unless the Secretary of Health, Education and Welfare sees fit to grant them. This court feels very strongly that the Department of Health, Education and Welfare and the Department of Justice should not urge the adoption of a plan upon this court, giving assurance of practically unlimited funds to implement it, and then, through neglect, inaction or misdirection, effectively frustrate its implementation.

Giving consideration to the evidence adduced at the hearing on November 26, 1971, the Court has adopted the following Comprehensive Educational Plan for the San Felipe Del Rio Consolidated Independent School District, which contains the following elements:

a. Professional Staff Treatment and Assignment

b. Curriculum Design and Content and Instructional Methodology

c. Student Assignment and Classroom Organization

d. Staff Development

e. Parent and Community Involvement

f. Special Education

g. Non-Instructional Support

h. Funding and Timing

i. Evaluation of Comprehensive Plan

This plan is ordered to be effectuated in the belief that it can be implemented by the District, if adequately supported by Federal grants.

## II. PROFESSIONAL STAFF TREATMENT AND ASSIGNMENT

The consolidated school district shall adhere to the following basic principles in the treatment and assignment of staff:

(a) All valid contracts currently existing between the former San Felipe Independent School District and professional staff employed by that district, and between the former Del Rio Independent School District and professional staff of that district, be honored in their entirety by the consolidated district.

(b) All professional staff of both the former San Felipe Independent School District and the Del Rio Independent School District who had been granted tenure prior to consolidation are to be considered as tenured in the new consolidated district.

(c) Any demotions in position, salary, or responsibility of any members of the professional staff of the

new consolidated district shall occur in accordance with the orders of the Court in this case.

(d) Principals of schools in the two previously existing districts will serve in the same administrative positions in the new consolidated district; however, assignment to specific schools should be made in a manner which insures geographic dispersal, so that members of one ethnic group will not be concentrated in any geographic area.

(e) The District will undertake vigorous recruitment and staff development effort toward a long-range goal that the ethnic composition of the administrative staff approximate the ethnic composition of the school district community.

(f) The administrative staff, faculty and other staff who work directly with children in the new consolidated district should be assigned so that the ethnic ratio of teachers and staff who work with children in each school is substantially the same as the ethnic ratio of teachers and staff who work with the children in the district as a whole.

## III. CURRICULUM DESIGN AND CONTENT AND INSTRUCTIONAL METHODOLOGY

In order to ensure safeguards against the educational exclusion of any educationally or economically deprived child enrolled in the San Felipe Del Rio Consolidated Independent School District, it is necessary that this comprehensive plan for the new consolidated district recognize the responsibility of the educational agency to provide an individualized instructional program which is compatible with their cultural and learning characteristics. The following plan for curriculum design provides for such safeguards, while recognizing the cultural and linguistic pluralism of the student body and providing equal opportunity for reinforcement and expansion of that pluralism to provide for the character-

istics of the child's immediate environment and the characteristics of the larger environment in which he shall function in the future. The plan is based on three principles:

—that the cultural and linguistic pluralism of the San Felipe Del Rio Consolidated Independent School District student body necessitates the utilization of instructional approaches (in addition to those now used) which reflect the learning styles, background and behavior of all segments of the student community: modification of curriculum design, and the development of new instructional skills and materials are part of the development of pluralistic instructional approaches.

—that the educational program of the district should incorporate, affirmatively recognize and value the cultural environment and language background of all of its children so that the development of positive self-concepts in all children of the district can proceed apace, toward both the immediate and ultimate goals of these children functioning effectively in a pluralistic society.

—that language programs be implemented that introduce and develop language skills in a secondary language (English for many Mexican-American students, Spanish for Anglo students), while at the same time, reinforcing and developing language skills in the primary language, so that neither English nor Spanish is presented as a more valued language, even though it will be called to the attention of the students that English is the basic language of the United States.

### A. *Early Childhood Education Program.*

The San Felipe Del Rio Consolidated Independent School District will implement an early childhood program for 3- 4- and 5-year old economically disadvantaged children which will focus on the development of basic cognitive skills

as well as the development of bilingual (Spanish and English) capabilities in children. Such a program will be implemented as soon as practicable.

All children will be included in the future development of the program. Implementation of the program shall be programmed for rapid, yet educationally sound, development. Some of the initial activities to be conducted include: staff selection and development: formulation of a design for parental involvement: establishment of program objectives and meeting noninstructional needs. Previously developed early childhood education programs will be examined to aid in the development of a program designed to meet the needs of the San Felipe Del Rio Consolidated Independent School District children. The program will reflect compatibility with the child's cultural and linguistic characteristics. Such a program shall:

(a) provide instruction in the language system of the child as one or more additional language systems are developed:

(b) provide for teaching methodology compatible with the child's learning style, including his: (1) preferred mode of communication, (2) preferred mode of relating, and (3) motivational style:

(c) provide for the systematic development of basic cognitive, affective, psychomotor skills, including: (1) problem solving, (2) auditory discrimination, (3) sensory-motor, (4) language development, and (5) perceptual:

(d) provide for a process-oriented curriculum:

(e) provide for the development of self-direction and choice making skills:

(f) provide for the reinforcement of the child's cultural heritage and ethnic identity and for an understanding and appreciation of that of others:

(g) provide for small group and individualized instruction:

(h) provide for the utilization of community personnel reflective of the student population in terms of ethnicity, economic status, and area of residence in para-professional roles:

(i) provide for meeting the non-instructional needs of the children including health, nutritional, and family services assistance:

(j) provide for comprehensive parental involvement at both the planning, implementation and evaluation level of the program as well as at the instructional level as parent volunteers fully engaged in the learning-teaching process.

B. *Grades K–4.*

The San Felipe Del Rio Consolidated Independent School District shall implement a K–4 program that presents to all children a bilingual-bicultural instructional program which utilizes the child's language system (English, Spanish, or a blend of both) as the medium of instruction as proficiency in one or more additional language systems is developed. This shall be accomplished by the implementation of at least the following:

—grouping of instructional units to include not more than 60 students (including migrants) to be served by: two bilingual bicultural teachers or one bilingual-bicultural teacher and one mono-bicultural teacher: two bilingual community para-professionals and one or more volunteer parents;

—team teaching and small group methodologies such as those which presently characterize the open classroom concept will be utilized:

—development of curriculum materials and methodologies to reflect a culturally pluralistic instructional approach:

—evaluation and subsequent modification of all instructional materials for the removal of all stereo, ping historical misrepresentations and

other negative cultural presentations:

—implementation of both English as a second language and Spanish as a second language components as part of the instructional program:

—implementation of individualized and small group instructional activities for meeting specific learning needs of individual children or groups of children:

—utilization of bilingual/bicultural staff specialists in diagnostic roles for the development of prescriptive teaching:

—initiation of comprehensive staff development activities responsive to the implementation of these strategies:

These strategies must be implemented within the context of heterogenous classroom composition which includes the absorption of migrant children and handicapped children as members of all classroom populations with the exception of severely handicapped children who cannot function in the regular classroom.

C. *Grades 5–6.*

In grades 5 and 6 the San Felipe Del Rio Consolidated Independent School District shall implement a two-phased development plan which will enable all students enrolled in the 5th and 6th grade in September of 1972 to be full participants in the bilingual-bicultural instructional program which accepts the child's preferred mode of communication (i. e., language system) as the language of instruction while one or more additional language systems are developed. This shall be accomplished by the implementation of at least the following:

In 1971–72:

—Assignment of bilingual-bicultural resource teachers at a ratio of one teacher to three hundred students to serve fifth and sixth grade classrooms:

—Initiation of English as a second language strategies on a prescriptive basis for students diagnosed to need additional English language development:

—Initiation of Spanish as a second language program for all children: initiation of prescriptive Spanish as a second language instruction for children diagnosed as deficient in Spanish language development:

—Implementation of individualized, individually prescribed and small group instruction:

—Development of culturally relevant, fair and reinforcing instructional materials in social studies:

—Evaluation and subsequent modification of all instructional materials for the elimination of all stereotyping, historical misrepresentations and other negative cultural presentations:

—Assignment of bilingual/bicultural staff specialists in diagnostic roles for the development of prescriptive teaching:

In 1972–73:

—Initiation of a bilingual/bicultural instructional program which accepts the child's preferred mode of communication (i. e., language system) as the language of instruction while one or more additional language systems are developed:

—Development or adaptation of instructional materials to ensure reinforcement of both the languages and the various cultures represented in the student body:

—Continuation of English as a second language and Spanish as a second language instruction on a prescriptive basis to serve children diagnosed as deficient in either language.

D. *Grades 7–8.*

The two-phase program implemented in grades 5 and 6 shall be implemented within the identical time sequence in grades seven and eight. Additionally, the district shall:

—Implement a comprehensive counseling program using bilingual/bicultural personnel aimed at decreasing

the drop-out rate and increasing both the availability of academic options for students preparing to enter high school and their receptivity to such options:

—Implementation of inter-cultural awareness and understanding program utilizing group guidance and other appropriate strategies.

E. *Grades 9, 10, 11 and 12.*

The San Felipe Del Rio Consolidated Independent School District Shall implement, as soon as practicable and prior to the 1972–73 school year, a program which includes: (1) the immediate implementation of instructional and non-instructional activities which respond to the pluralistic characteristics of the student population, provide sequence and continuity to the instructional activities conducted at the two previous high schools, and respond to the motivational styles and socio-economic constraints of students from differing socio-economic and cultural backgrounds: and (2) the development of an instructional program including course offerings, instructional materials, and methodologies which respond to and capitalize on the needs and capabilities of students who have been involved in bilingual/bicultural education. This shall be accomplished by implementation of at least the following:

—Assignment of bilingual/bicultural diagnostic staff specialists among testing and evaluation personnel:

—Assignment of bilingual/bicultural personnel in the guidance and counseling program of the school:

—Assignment of one bilingual/bicultural teacher to implement English as a second language instruction on a prescriptive basis:

—Development of an intensive program to identify scholarships and financial assistance for disadvantaged and all other students, with priority to be given to disadvantaged students, assist disadvantaged and all other students in reenrolling in college, with priority to be given to disadvantaged students:

—Modification and expansion of literature and social studies curriculum to reflect pluralistic characteristics of the student population: provide cultural reinforcement, and historical, anthropological and sociological accuracy:

—Modification and expansion of home economics curriculum to respond to the life styles, family structures and needs of children in all cultures represented in the student body:

—Assignment of bilingual/bicultural personnel to coordinate development and implementation of literature, social studies and home economics programs:

—Initiation of ethnic studies courses:

—Evaluation of vocational education and home economics programs in terms of (1) relevance of offerings to current community needs and projected needs and (2) the maintenance of student-centered decision making as to options within and without vocational education:

—Implementation of an inter-cultural awareness and understanding program utilizing group guidance and other appropriate strategies:

—Assignment of bilingual/bicultural High School Curriculum Development Director whose duty shall be to develop an instructional program, including course offerings, instructional materials and methodologies which respond to and capitalize on the needs and capabilities of students.

F. *Summer and Enrichment Programs.*

The San Felipe Del Rio Consolidated Independent School District shall develop programs beyond the regular instructional programs which effectively continue to extend the services extended to children in the districts prior to consolidation. Summer pre-school and elementary programs, neighborhood youth corps programs and other enrichment programs should be offered. The

new school district shall continue the practice of providing summer job opportunities for disadvantaged college students in the summer programs.

## IV. STUDENT ASSIGNMENT AND CLASSROOM ORGANIZATION

The combined migrant student projections for the San Felipe Del Rio Consolidated Independent School District indicate that approximately 1,100 students qualify as migrants. This represents approximately 15% of the total school population.

Special educational needs of migrant students will necessitate the instructional grouping of such students for a portion of the regular school day. Such groupings, however, will not exceed one hour of the regular school day. Migrant students will be assigned to regular heterogeneous classrooms and provision for classroom spaces (to be reserved for migrant students) shall be made at the beginning of the academic year, in order that migrant students be assured of placement in regular classrooms. Student assignment to courses which require or utilize pre-enrollment or pre-registration procedures will be made on a first-come, first-serve basis. Students from the two consolidating districts will be allowed to enroll in any courses having as prerequisites courses not offered in the school they previously attended or not required as part of the basic academic program the student was pursuing in the previously attended school, upon recommendation of the principal of the school which the student previously attended.

## V. STAFF DEVELOPMENT

### A. *Basic Assumptions.*

1. Discriminatory practices and prejudice have no place in either the education of children or the selection and training of staff:

2. The fruition of any curriculum design is contingent upon maintaining the most competent available personnel:

3. For an adequate program of bilingual/bicultural education to function, bilingual/bicultural personel reflective of the various ethnic and cultural backgrounds of the student body must be employed:

4. The needed competencies and understanding requisite to a desirable educational program for all children can be developed through careful staff selection and effective in-service training.

### B. *Staff Development Plan.*

The following staff development is designed to provide equal access to the full benefits of the District's educational program for all children in the District.

1. The San Felipe Del Rio Consolidated School District will develop and implement a comprehensive staff development plan which will increase the capabilities of the District's staff (administrative, instructional, counseling, and paraprofessional) to respond to the needs of minority group students and all other students.

2. The District should submit this plan to a court appointed Multi-Ethnic Advisory Committee for review, comment and suggestions no later than thirty days from the appointment of such committee. The approved plan should be ready for initiation within sixty days from the date the School Board receives the report of the Multi-Ethnic Advisory Committee.

3. The Staff Development Plan will include as a minimum the following components:

   (a) Direct involvement of community representatives of all ethnic groups on an equal basis in planning, implementation, monitoring and evaluation.

   (b) Involvement of school personnel from all levels on an equal

basis in planning, implementation, monitoring and evaluation.

(c) Appointment, within thirty days of approval of the Staff Development Plan, of a full-time Staff Development Plan Coordinator. The Multi-Ethnic Advisory Committee should be consulted on recommendations for the Coordinator and should work with the Superintendent in developing the job description for the position.

(d) Immediate initiation of systematic and intensive efforts to recruit minority group staff at the professional, para-professional and non-professional level.

(e) Immediate development of a management plan to implement the staff development plan and to ensure continued involvement by all segments of the community in all phases.

(f) Initiation of a Special Career Development Program. This program will provide and support the identification, multiple-level entry and placement of Mexican-American and other minority group members into all levels of the school system (i. e., administrative, supervisory, pupil personnel services, guidance and counseling, teaching and other supportive staff).

To insure effective implementation of this component, the Multi-Ethnic Advisory Committee shall designate a three-person sub-committee from its membership to monitor this aspect of the Plan. The Special Career Development Program will include as a minimum:

1. Specific selective criteria which reflect the need in this system for competent bilingual/bicultural supervisory, administrative and teaching personnel who are sensitive to the needs of all children.

2. A time schedule designed to bring systemwide minority employment to an equitable level at the administrative, supervisory and teaching levels.

3. A plan for disseminating information on specific selection criteria to all levels of the system and the community, in accordance with the orders of the court.

4. Provisions to ensure upward mobility of minority group personnel into supervisory and administrative positions at all levels based on individual demonstrated and potential ability and District needs.

(g) Initiation of a systemwide staff training program developed through joint staff and community effort which will include at least the following components:

1. Cultural awareness training that will include School Board members, key community leaders, administrative staff, teaching personnel, counseling and guidance personnel and parents.

2. Curriculum development to meet the needs of all children.

3. Pupil diagnosis, prescriptive teaching and behavior modification strategies.

4. Bilingual, oral language assessment and ESL training.

5. Team teaching and differentiated staffing.

6. Tests and measurements techniques for measuring bicultural student performance.

Such a staff training program shall be implemented with technical assistance support provided by resources both external and internal to the District. All of the above training activities shall be initiated during the 1971–72 school year.

(h) The San Felipe Del Rio Consolidated Independent School District and representatives from appropriate teacher training institutions will execute plans leading to training activities which will assist participants where appropriate in obtaining credit toward certification.

## VI. PARENT AND COMMUNITY INVOLVEMENT

An essential element of a comprehensive educational program is the active involvement of parents and other community members in planning and operating the schools. If the atmosphere is one of cooperation, the parents view the school as a partner in a difficult but rewarding task—the education of children. Teachers also learn from parents about the cultural and environmental background of the children. With appropriate staff development, teachers can draw on parent and community resources in providing learning experiences which meet the needs of all the children in school.

Accordingly, multi-ethnic school community councils will be established for the school district. The councils will be provided by the District with training and guidance essential to educate their members with the basic concepts of effective educational planning and evaluation.

The School Community Councils shall make a yearly evaluation of the new consolidated district's education program and shall assist the school district in formulating education goals and objectives. The School Community Councils shall assist the school district in the assignment and evaluation of students for possible placement in Educably Mentally Retarded and Minimally Brain Injured classes.

## VII. SPECIAL EDUCATION

The assignment of students to special education classes has been specified by the Texas Education Agency regulations. These specifications will be followed specifically in conducting the special education program of the District. In addition, a consultant will be employed to suggest program modification and improvements within the Texas Education Agency guidelines.

The following steps will be taken:

(1) As in the case of the other staff, recruitment and selection of special education teachers will include those who can teach in both Spanish and English, and who have an understanding of the cultural backgrounds of minority group children and all other children in the program.

(2) The continued development and implementation of adequate screening, appraisal and assignment techniques that have as an integral part the assessment of the child's behavior at home, at school, and among his peers, and that in no way penalize those students whose home language is Spanish.

(3) The continued development of curricula and individualized teaching strategies that reflect the particular needs of the bilingual/bicultural child.

(4) An intensive effort to maintain a communication bridge between the parent and the school in such a way that parents not only have a knowledge of the entire special education program and its effect on their child, but also are assisted by the school to provide considerable input into the functioning of the program.

(5) Inclusion of special education staff in the staff training program to develop an awareness of the cultural and linguistic factors that each child brings to school.

The committee that makes final assignment of students to special education classes shall include at least one Mexican-American teacher and one Mexican-

American parent. This linkage will again serve as a course of dissemination of programs, goals, and objective information from school to community. The total committee should reflect the overall ethnic composition of the students in the total program.

All communications with parents, written and oral, shall continue to be in the language they best understand.

## VIII. NON-INSTRUCTIONAL SUPPORT

Co-curricular activities (all school-related activities that can be classified as non-academic) play an important part in the total educational experience of students. In order to assure equal educational opportunity in the new consolidated district, the following steps will be taken:

A. A new co-curricular program shall be developed so as to reflect the background and interests of all students in the consolidated district, including but not limited to: school councils, honors organizations and programs, clubs, bands, parent organizations, booster clubs, school mascots, songs, chants, cheers, fraternities and sororities, school publications, dramatic activities, social activities such as dances, proms and banquets.

B. The reorganization and development of the new co-curricular program shall proceed on the basis that all previously existing school mascots, songs, chants, newspaper and yearbook names and school club or organization names are now null and void. The new student body in each school shall by general election select and name all of the above-named items, subject to approval of the School Board in the event that any of the above named items are given names which are offensive or against public policy.

C. All organizations, clubs and activities of the consolidating districts shall be merged by holding new elections for officers of organizations and clubs and reorganizing social and athletic activities.

D. Special consideration shall be given to the naming of honor students in the 1971–72 school year by the San Felipe Del Rio Consolidated Independent School District. The 1972 graduating class shall have co-valedictorians and co-salutatorians named from the 1970–71 eleventh grade classes at the former Del Rio and former San Felipe high schools, respectively.

## IX. FUNDING AND TIMING

It is recognized that implementation of the foregoing Plan will require an expenditure of funds greater than the amount now being expended by the district. It is also understood that the implementation of some programs contained in the Plan is dependent upon availability of additional funds from Federal, State, local or other sources.

Taking into account the funding problems confronting the San Felipe Del Rio Consolidated Independent School District, the following will be done immediately:

(a) Each element of the foregoing Comprehensive Education Plan now being carried on in the District will be continued and those elements of each program component that can be implemented from resources presently available to the District will be implemented:

(b) The District will, in good faith, continue to make application for sufficient funds from Federal, State and other sources to effectuate all elements of the Comprehensive Plan. Assistance in locating, making application for and securing funds for the Comprehensive Plan will be sought and provided on a continuing basis through the Department of

Health, Education and Welfare, the United States Office of Education, the Texas Education Agency and elsewhere in compliance with the orders of this Court.

Insofar as the school district is incapable of implementing all elements of the Comprehensive Plan immediately, the following priorities, for expenditure of funds and utilization of personnel, are established:

1. Staff training and development in accordance with the requirements of the Plan.

2. The bilingual/bicultural educational programs presently being operated or called for in accordance with the Plan.

3. Early childhood education program for three, four and five year olds.

4. Counseling programs for seven and eight grade levels, presently in operation or called for in accordance with the Plan.

5. The program for teaching of English as a second language, presently being operated or called for in accordance with the Plan.

6. Special Education.

7. All other components of the Plan not listed above.

The obligation of the San Felipe Del Rio Consolidated Independent School District exists above and apart from the question of financing, and the District will commit such local funds as are available to the implementation of the Comprehensive Plan.

Special reports relating to the efforts being made to obtain funds from Federal, State and other sources to effectuate all elements of the Comprehensive Plan shall be made to this court by the Superintendent of the San Felipe Del Rio Consolidated Independent School District on the 12th and 28th days of each month for the remainder of the 1971–72 school year, beginning December 12, 1971. Specific and detailed explanations of any obstacles encountered shall also be reported. Copies of such report shall be forwarded forthwith to counsel for all parties, including counsel for the Amici Curiae, and to each of the members of the panel of the Court of Appeals for the Fifth Circuit which may consider this civil action on appeal.

Progress toward full implementation of the Comprehensive Plan will be reported to the Court, copies to the parties, on February 15, 1972 and May 15, 1972 and semi-annually thereafter on October 15 and February 15. Each report to the Court will describe in detail the elements of the Plan not in operation at that time. For those elements not in operation an explanation will be required, and a description of efforts to secure funding will be required.

## X. EVALUATION OF COMPREHENSIVE EDUCATIONAL PLAN

The school district administrative staff shall develop a comprehensive evaluation plan for all programs hereinbefore described. This evaluation process shall include a component for determining the effectiveness of all programs with respect to individual students as well as students as part of a racial or ethnic group.

To insure a more comprehensive evaluation process, an educational consultant team shall be invited to work with administrators, teachers, and parents in an effort to provide educational expertise in resolving any problems confronted in the implementation of the comprehensive plan.