UNITED STATES of America

v.

STATE OF TEXAS et al.

(Gregory–Portland Independent School District Intervention).

Civ. A. No. 5281.

United States District Court,
E. D. Texas,
Tyler Division.

Aug. 6, 1980.

Terry Milton, Civ. Rights Div., Dept. of Justice, Washington, D. C., for United States.

Susan Dasher, Asst. Atty. Gen., Austin, Tex., for TEA and State of Texas.

Richard A. Hall, Corpus Christi, Tex., for Gregory–Portland.

## MEMORANDUM OPINION

JUSTICE, Chief Judge.

In 1970 and 1971, this court issued orders in *United States v. State of Texas*, 321 F.Supp. 1043 (E.D.Tex.1970), 330 F.Supp. 235 (E.D.Tex.1971), requiring the Texas Education Agency ("TEA"), *inter alia*, to minimize racial segregation in the public schools of Texas by refusing to accredit and distribute state monies to those school districts which discriminate on the basis of race. Continuing jurisdiction was retained by this court to oversee TEA's ongoing responsibility to diminish segregation in the state's schools. With slight modifications, these orders were affirmed by the Court of Appeals for the Fifth Circuit, 447 F.2d 441 (1971), *cert. denied*, 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). The modifications were incorporated in subsequent orders of this court, dated July 13, 1971, and August 9, 1973. Pursuant to the Fifth Circuit's modification, the August 9, 1973, order permitted any school district to petition this court for relief when faced with a cut off of funds for suspension of accreditation by TEA.

On November 5, 1973, TEA sent a letter to the Gregory Portland Independent School District ("GPISD"). In essence, the letter stated that, by its practice of segregating Mexican American students, the district had violated the standards laid down in *United States v. Texas*; further, that the district would face suspension of accreditation and withholding of state funds if the violations were not remedied. TEA proposed student assignment plans to remedy the violations, but these plans were not accepted by GPISD. Rather than petitioning this court for relief, GPISD filed suit in the United States District Court for the Southern District of Texas, seeking temporary and permanent injunctions to prevent TEA from suspending accreditation and funding, and demanding a declaratory judgment that GPISD had not discriminated on the basis of race. On January 30, 1976, the United States District Court for the Southern District entered judgment granting the relief requested by the GPISD. On appeal,[1]

---

1. The appeal was initiated by the United States, which had sought and been denied leave to intervene by the District Court for the Southern District. TEA did not file an appeal from the decision in the Southern District.

the Fifth Circuit held that the Southern District had no jurisdiction to determine these matters and directed it to dissolve the injunction, vacate all orders, and to dismiss the action or transfer it to this court. *Gregory–Portland Independent School District v. Texas Education Agency*, 576 F.2d 81 (5th Cir. 1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979). The transfer was effectuated on March 16, 1979, and the civil action has now been consolidated with *United States v. Texas*. GPISD now seeks the same relief here as was sought by it from the United States District Court for the Southern District of Texas.

## I.

### A.

*Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), marked the Supreme Court's first encounter with a school desegregation case where racial separation of students had not been previously mandated by a state constitutional provision or statute. In *Keyes*, the Court held that the touchstone of a Fourteenth Amendment violation in such circumstances is the finding of an *intent* on the part of school authorities to discriminate. "We emphasize that the differentiating factor between *de jure* segregation and so–called *de facto* segregation to which we referred in *Swann [v. Charlotte ·Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554] is *purpose* or

*intent* to segregate." 413 U.S. at 208, 93 S.Ct. at 2697.[2] Prior to *Keyes*, it had been the holding of the Fifth Circuit that intent need not be proven; that even where school segregation was non–statutory, the fact that it was caused by state action sufficed to make out a constitutional violation.[3] This court held the same view; therefore, in the prior *United States v. Texas* opinions, the issue of segregatory intent was never addressed.

> The record in this case demonstrates that the policies and practices of TEA in administering the public school system in Texas have frequently--whether inadvertently or by design --encouraged or resulted in the continuation of vestiges of racially segregated public education within the state.

321 F.Supp. at 1057.

> The existence of unconstitutional discrimination is not determined solely by intent
> . . . .

330 F.Supp. at 244.

As of 1954, the Texas Constitution explicitly required the segregation of Black children in the public schools.[4] The TEA is thus under a continuing affirmative obligation to eliminate "all vestiges of state–imposed segregation" against Black students. *Keyes*, 413 U.S. at 200, 93 S.Ct. at 2693, *Swann v. Charlotte Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Because no

---

**2.** Citing *Swann v. Charlotte·Mecklenburg Board of Education*, 402 U.S. 1, 17· 18, 91 S.Ct. 1267, 1276–1277, 28 L.Ed.2d 554 (1971).

The *de jure/de facto* distinction, which has created no small amount of confusion over the years, has been described as a means of differentiating "between unconstitutional ('de jure') segregation, which arose from explicit assignment of pupils on the basis of race, and permissible ('de facto') segregation, which arose from causes other than race–conscious government action." Note, *Reading the Mind of the School Board; Segregative Intent and the De Facto/De Jure Distinction*, 80 Yale L.Journal 317 (1976).

**3.** *See Morales v. Shannon*, 516 F.2d 411, 412· 413 (5th Cir. 1975): *Keyes* "supervened our holding in *Cisneros v. Corpus Christi Indepen-*

*dent School District*, 5 Cir. (en banc), 1972, 467 F.2d 142, to the extent that *Keyes* requires, as a prerequisite to a decree to desegregate . . . proof of segregatory intent as a part of state action. We said not in Corpus Christi, holding cause and effect a sufficient basis, but the Supreme Court held to the contrary in *Keyes*." *See also United States v. State of Texas (San Felipe Del Rio Independent School District)*, 342 F.Supp. 24, 24-·25 (E.D.Tex.1971), where this court did not address intent in finding unconstitutional discrimination against Mexican--American students, but relied on the fact that the segregated school system "existed as the result of state action."

**4.** Constitution of the State of Texas, Art. 7, § 7 (1976).

further showing of intent need be made, the *Keyes* holding raises no question as to the continued vitality of this court's orders in *United States v. Texas*, as they apply to discrimination against Black students.[5] However, the segregation of Mexican–American students was not mandated by Texas state law. Hence, the effect of the supervening *Keyes* intent requirement on *United States v. Texas*, as it relates to Mexican–Americans, is presented for consideration.[6]

Before proceeding further, it is important to note that the problems inherent in Mexican–American desegregation cases are of the same magnitude as those in similar cases involving Black Americans. Clearly, Mexican–Americans are an identifiable ethnic group, historically subjected to many of the same discriminatory deprivations which Black Americans have been forced to suffer.[7] Segregation of Mexican–American students, like that of Black students, can generate "a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely- ever to be undone." *Brown v. Board of Education*, 347 U.S. 483, 494, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954); *see Keyes*, 413 U.S. at 195–198, 93 S.Ct. at 2690–2692.

This court dealt specifically with the segregation of Mexican–American students in *United States v. State of Texas (San Felipe Del Rio Independent School District)*, 342 F.Supp. 24 (E.D.Tex.1971), where some intimations of a finding of intentional discrimination against Mexican–American students can be found:

> In other words, had it not been for the substantial contributions of the state under the terms of the Texas Minimum Foundation program and under other various additional arrangements, neither the former San Felipe School District nor the former Del Rio School District could have continued in operation. Hence, since the state and its agencies knew, or should have known of the segregated educational system being operated, largely at state expense, ... and in light of this Court's previous findings of fact and conclusions of law concerning the State of Texas and the Texas Education Agency in this case [citations omitted], this Court believes that the segregated system described above existed as a result of state action.

342 F.Supp. at 25. Despite such intimations, the ultimate determination of a constitutional violation was based on the fact that the segregated system "existed as a

5. "Such *statutory dual educational systems are* unconstitutional per se under *Brown v. Board of Education* [347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873] .... A school board is under an affirmative duty to convert a dual school system to a unitary system. *Swann v. Charlotte–Mecklenburg Board of Education.*" *United States v. Texas Education Agency (Austin III)*, 564 F.2d 162, 165 n. 2 (5th Cir. 1977) (J. Wisdom).

6. Of course, the law of the case doctrine would ordinarily preclude the necessity for re–examining TEA's liability. *See Evans v. Buchanan*, 555 F.2d 373, 378 (3rd Cir. 1977) (refusing to re–examine liability in a school desegregation case despite the intervening Supreme Court decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597). Here, however, where the *Keyes* decision and later cases marked a significant development in school desegregation law subsequent to the prior opinions in this action, the court feels it important to again assess the constitutional issues in light of present authority. *See United States v. Texas Education Agency (Austin II)*, 532 F.2d 380 (5th Cir. 1976), where the Fifth Circuit re–examined

and reaffirmed its earlier finding of unconstitutional discrimination against Mexican–American school children, *(Austin I*, 467 F.2d 848 (5th Cir. 1972) *(en banc))*, in light of the supervening decision in *Keyes*.

7. *See generally*, Rangel and Alcala, *Project Report: De Jure Segregation of Chicanos in Texas Schools*, 7 Harvard Civ.Rts.–Civ.Lib.L.Rev. 307 (1972); Note, *Mexican–Americans and the Desegregation of Schools in the Southwest*, 8 Houston L.Rev. 929 (1971); Comment, *Brown v. Board of Education Applies to Mexican–American Students and Any Other Readily Identifiable Ethnic–Minority Group or Class*, 49 Texas L.Rev. 337 (1971); The United States Commission on Civil Rights, Mexican–American Education Study, Report 1, Ethnic Isolation of Mexican–Americans in the Public Schools of the Southwest (April, 1971); The United States Commission on Civil Rights, Mexican–American Educational Series, Report 2, The Unfinished Education (October 1971) (cited in *Keyes*, 413 U.S. at 197, 93 S.Ct. at 2691).

result of state action", and the question of intent was not decided.

A brief historical review is appropriate to put the question in perspective. The 1876 Constitution of the state of Texas included the following provision: "Separate schools shall be provided for the white and colored children and impartial provision shall be made for both." [8] In 1930, a Texas Court of Civil Appeals held that Mexican–Americans were not to be segregated from white students under this clause of the constitution, but added that, in certain instances, language differences could furnish the justification for separate Mexican–American schools. *Independent School District v. Salvatierra*, 33 S.W.2d 790 (Tex.Civ.App.–San Antonio, 1930), *cert. denied*, 284 U.S. 580, 52 S.Ct. 28, 76 L.Ed. 503 (1931). Both before and after the *Salvatierra* decision, however, many school districts throughout the state, including the predecessor districts to the GPISD,[9] maintained explicitly separate "Mexican schools." [10]

In 1948, the federal district court for the Western District of Texas, writing in *Delgado v. Bastrop Independent School District*, Civil Action No. 388 (W.D.Tex.1948) (unreported), pronounced the unconstitutionality of the arbitrary segregation of Mexican–American students. The State Board of Education (TEA's predecessor) thereupon promulgated regulations and policy statements reflecting the *Delgado* decision.[11] The Attorney General of Texas occasionally issued opinions, in response to specific school district inquiries, to the effect that Mexican–American students could not be segregated solely on the basis of their ancestry.[12]

The public pronouncements of certain state officials, responding to the *Delgado* decision, were in opposition to segregation. Nonetheless, the evidence presented in this case in present and prior hearings demonstrates that the State of Texas and its educational administrative agencies have persistently and intentionally segregated and discriminated against Mexican–American children in the public schools.

The most telling evidence against TEA in connection with this issue are its admissions, which were made in the course of this and related litigation. Indeed, in its brief filed in this action, TEA devotes an entire section to the question, headed as follows: "The application of the De Jure remedy set forth in *United States v. Texas*, No. 5281 (August 9, 1973), is fully justified in the context 'of one race schools for Mexican–Americans." More detailed admissions made by TEA are in the factual stipulations entered into by TEA and other parties in a separate segment of this case, *United States v. Texas* (Bilingual), No. 5281 (E.D. Tex.), a copy of which was introduced as an exhibit at the GPISD trial.[13]

Included among the admissions by TEA are the following:

"State education authorities cooperated to allow local school districts to *systemat-*

---

8. Constitution of the State of Texas, Art. 7, § 7 (1876).

9. See Part III of this Opinion for a historical discussion of segregation within GPISD.

10. *See generally* W. Little, *Spanish Speaking Children in Texas* (1944); Rangel and Alcala, *Project Report: De Jure Segregation of Chicanos in Texas Schools*, 7 Harv.Civ.Rts.–Civ.Lib. L.Rev. 307, 311–314 (1972).

11. Superintendent of Public Instruction, Instructions to Regulations (1948).

12. See letter of June 11, 1949, from Price Daniel, Attorney General of Texas, to L. A. Woods, State Superintendent of Public Education in Texas.

13. United States Exhibit 10. Attorneys for GPISD objected to the introduction of these stipulations as an exhibit in the Gregory–Portland matter, since GPISD was not a party to the stipulations. However, the stipulations pertain only to the state's and TEA's liability and not specifically to GPISD. The latter's agreement to the stipulations, therefore, was not necessary to verify their accuracy. Furthermore, attorneys for GPISD had an opportunity to introduce countervailing evidence to attempt to disprove the factual admissions of TEA and to disprove the existence of statewide *de jure* discrimination against Mexican–American school children. GPISD did not choose to do either.

*ically reject* the burden of *Delgado.*" Stipulation No. 735 (emphasis added).

"*Texas sanctioned creation of separate school systems* through approval of construction bonds which school minutes indicate were explicitly designed for the construction or repair of Mexican schools." Stipulation No. 750 (emphasis added).

"The State Department of Education in Texas, by allowing county school trustees to classify schools on 'the basis of conditions and needs regardless of the wishes of the residents of the local district,' *sanctioned the locals interpretation as a general authorization to continue a system of segregated schools.*" Stipulation No. 733 (emphasis added).

"When the Mexican American school age population grew rapidly, *Mexican–American districts* were created to serve them." Stipulation No. 730 (emphasis added).

"Official publications of the Texas State Department of Education at one time reflected a policy of Anglo racial domination over Mexican–American people, their language and culture." Stipulation No. 704.

"Segregation of Mexican American students is a historical fact in the Texas Public Schools." Stipulation No. 701.

"Mexican–American children have historically been provided inferior facilities, often drastically overcrowded, sometimes necessitating ½ day classes." Stipulation No. 748.

"Negative stereotyping and racial isolation is a form of discrimination which still affects the educational experience of Mexican American students." Stipulation No. 702.

"Under the tri–ethnic system during 1920–40 formation of Mexican schools, Mexican Americans were required to attend Mexican schools regardless of residential proximity." Stipulation No. 743.

"The State school directory for 1931–32 evidenced patterns of locally established Mexican schools where school age population existed." Stipulation No. 742.

"By 1920, 'Mexican schools' existed in North, Central, West, and South Texas." Stipulation No. 740.

These admissions make it clear that segregation of Mexican–American students has existed and continues to exist in Texas, and that this segregation is directly traceable to the intentional actions of state education officials.

The admissions also demonstrate that TEA and its predecessor agency knew of the segregation of Mexican–American students in Texas; yet the agency continued to fund and accredit those school districts which were segregated. This funding and accreditation unquestionably permitted the districts effectively to continue their unlawful practices. Indeed, without the financial and other contributions of the state, many of the segregated school districts could not continue in operation. *United States v. Texas (San Felipe Del Rio Consolidated Independent School District)*, 242 F.Supp. at 25. Simple logic shows that state education authorities, knowing of segregated conditions and being aware that state contributions were necessary to support and maintain some of the segregated school districts, were fully cognizant of the consequence: that state contributions promoted and supported segregation of Mexican–American students in Texas schools. "Adherence to a particular policy or practice, 'with full knowledge of the predictable effects of such adherence upon racial imbalance in a school system is one factor among many others which may be considered by a court in determining whether an inference of segregative intent should be drawn.'" *Columbus Board of Education v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979), quoting with approval the district court opinion, 429 F.Supp. 229, 255 (S.D. Ohio 1977).

Further evidence for a finding of intent comes from Texas state law, specifically, a Texas statute prohibiting the speaking of Spanish in the public schools. Texas Penal Code Ann. art. 288 (Vernon, 1925). The statute was passed in 1909; in 1918, it was amended so as to make it a misdemeanor

offense and an automatic loss of a teaching certificate for a teacher to teach in a language other than English. This statute remained as a part of Texas law until its repeal in 1969; in some places, however, the "No–Spanish" rule remained in effect into the 1970's. Indeed, in October, 1970, a Mexican–American school teacher in the Crystal City Independent School District was indicted for teaching a United States history class in Spanish, although the indictment was later dismissed.[14] As TEA has admitted, the rule was enforced in many Texas schools in such manner as to prohibit Mexican–American children from speaking their native tongue anywhere on the school grounds.[15] According to TEA's stipulation, "[v]iolators of the 'no Spanish rule' were corporally punished, shamed, threatened, fined, suspended and expelled from school by Texas school administrators."[16] Finally, TEA has admitted that the statute "had a severe and debilitating effect on the education of Spanish speaking children for over 50 years."[17] TEA is correct. The presence of a statutorily mandated and rigorously enforced policy preventing a child from speaking his native tongue—the language which he and his parents may have spoken all of their lives, the language which is often spoken in their home, the language of their ethnic and national heritage—is calculated to produce the stigma of inferiority so soundly condemned in *Brown v. Board of Education*.

In addition to TEA's admissions of widespread Mexican–American public school segregation, the Fifth Circuit has made a number of findings of *de jure* segregation, applying the *Keyes* standard, in school districts throughout Texas. See *United States v. Texas Education Agency (Lubbock Independent School District)*, 600 F.2d 518 (5th Cir. 1979); *United States v. Texas Education Agency (Austin III) (Austin Independent School District)*, 564 F.2d 162 (5th Cir. 1977), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979); *Zamora v. New*

*Braunfels Independent School District*, 519 F.2d 1084 (5th Cir. 1975); *United States v. Midland Independent School District*, 519 F.2d 60 (5th Cir. 1975); *Morales v. Shannon (Uvalde)*, 516 F.2d 411 (5th Cir. 1975). These judicial determinations, alongside TEA's own admissions, show that segregation of Mexican–American students, stemming from intentional state action, exists in a substantial portion of the school districts in Texas. "[P]roof of state–imposed segregation in a substantial portion of the district will suffice to support a finding of the trial court of the existence of a dual system." *Keyes*, 413 U.S. at 203, 93 S.Ct. at 2695. Applying the *Keyes* formulation to the instant case, a presumption of statewide *de jure* segregation arises. The segregation of Mexican–Americans in any district of the state raises the further presumption that it is related to the state's intentional acts. As the Supreme Court recently noted in *Columbus*, "purposeful discrimination in a substantial part of a school system furnishes a sufficient basis for an inferential finding of a systemwide discriminatory intent unless otherwise rebutted, and that given the purpose to operate a dual school system one could infer a connection between such a purpose and racial separation in other parts of the school system." 443 U.S. at 467–468, 99 S.Ct. at 2952.

According to the Fifth Circuit's recent pronouncement, an additional presumption is generated by *Keyes*: a finding of intentional segregation against Black students creates a presumption that segregation against Mexican–Americans was also intentional. Writing for the panel in the latest installment of the lengthy Austin school litigation, Judge Wisdom said:

The second *Keyes* presumption is that " 'even if it is determined that different areas of the school district should be viewed independently of each other', 'a finding of intentionally segregative school board actions in a meaningful por-

---

14. United States Exhibit 10, Stipulation No. 744.

15. *Id.*, Stipulation No. 710.

16. *Id.*, Stipulation No. 711.

17. *Id.*, Stipulation No. 709.

tion of a school system ... creates a presumption that other segregated schooling within the system is not adventitious.'" 413 U.S. at 208, 93 S.Ct. at 2697. In a tri–ethnic setting, *Keyes* means that a finding of intentional segregation against one minority group raises the presumption that any segregation suffered by the second minority group was intentional. Here, there is no doubt [of discrimination] against blacks. This fact alone, therefore, created a presumption—here, we consider, unrebutted—that the segregated schooling of Mexican–Americans was not "adventitious."

*United States v. Texas Education Agency (Austin Independent School District)*, 579 F.2d 910 (5th Cir. 1978) (denying the petition for rehearing and rehearing *en banc* from the *Austin III* decision), *cert. denied*, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979). The state of Texas blatantly and intentionally discriminated against Black Americans through its constitutional provision mandating segregated schools. The presumption arises, therefore, that it has intentionally created the existing segregation of Mexican–American students.

Thus, *Keyes* calls for two presumptions, both leading to the proposition that the state of Texas is liable for *de jure* segregation of Mexican–American students. The first arises from the existence of intentional state action leading to segregation of Mexican–Americans in a substantial portion of the state's schools. The second stems from Texas' segregation of Black students, mandated as it was by the state constitution. No party to this action has come forward with evidence to rebut these presumptions of statewide *de jure* segregation. The Texas Education Agency, which would have the most information bearing on the issue, insists that there are indeed grounds for a finding of statewide *de jure* segregation of Mexican–Americans. GPISD has presented no evidence to contravene that assertion.

It should be noted that some of the intentional acts which give rise to the finding of *de jure* segregation occurred before 1954. In assessing liability for segregation resulting from those acts, this has little effect. As the Supreme Court opined in *Keyes*:

The Courts below attributed much significance to the fact that many of the Board's actions in the core city area antedated our decision in *Brown*. We reject any suggestion that remoteness in time has any relevance to the issue of intent. If the actions of school authorities were to any degree motivated by segregative intent and the segregation resulting from those actions continues to exist, the fact of remoteness in time certainly does not make those actions any less "intentional."

413 U.S. at 210–211, 93 S.Ct. at 2698.

■ Finally, the facial opposition of the State Board of Education and the Attorney General to the "Mexican schools" in the late 1940's in no way masks what the foregoing recital has made clear: that the State of Texas and its educational agencies have actively assisted in the intentional segregation of Mexican–American students on a statewide level and that this conduct produced substantial statewide impact. Public pronouncements of good faith by state authorities in no way obviate an unconstitutional intent to discriminate. *Cf. Columbus*, 443 U.S. at 457 n. 5, 99 S.Ct. at 2946.

B.

■ Once segregatory intent has been found to exist, as here, the state authorities come under the same affirmative obligation imposed upon statutory dual systems: to eliminate "all vestiges of state–imposed segregation." *Swann*, 402 U.S. at 15, 91 S.Ct. at 1275. The measure of this obligation "is the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." *Dayton Board of Education v. Brinkman (Dayton II)*, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979). The evidence indicates that TEA has yet to eliminate the vestiges of the state's intentional segregation.

TEA's own admissions, detailed earlier with respect to the issue of intent, relate a number of acts which also indicate a failure affirmatively to extirpate Mexican–American segregation. Furthermore, TEA has,

over the years, provided funds and accreditation to school systems which it knew to be segregated. It is clear that the foreseeable consequence of accrediting and funding these districts is to allow the continuing operation of the districts as segregated entities. As the Supreme Court said in *Dayton II*, "proof of foreseeable consequences . . . may itself show a failure to fulfill the duty to eradicate the consequences of prior purposefully discriminatory conduct." 443 U.S. at 536 n. 9, 99 S.Ct. at 2978.

In fact, this court made a finding in the original *United States v. Texas* opinion, which was affirmed by the Fifth Circuit, 447 F.2d 441, that TEA has not only failed to eliminate continuing vestiges of racial segregation, but, in addition, has exacerbated the segregation. "The record in this case demonstrates that the policies and practices of TEA in administering the public school system in Texas have frequently . . . encouraged or resulted in the continuation of vestiges of racially segregated public education within the State." *United States v. Texas*, 321 F.Supp. at 1057. It having been here determined that TEA is liable for the intentional segregation of Mexican–American students, the prior holding of *United States v. Texas* that TEA has not eliminated the vestiges of segregation, stands as "the law of the case." [18] None of the parties has introduced evidence to suggest that, in the years subsequent to the prior *United States v. Texas* opinion, TEA has totally fulfilled its obligation affirmatively to eliminate segregation. Indeed, TEA, with admirable candor, has admitted to its liability for the *de jure* segregation of Mexican–American students and its remaining obligation to eradicate that segregation.

## II.

### A.

The August 9, 1973, order of this court in *United States v. Texas* requires of TEA the following:

### F. *Student Assignment*

\* \* \* \* \* \*

(a) Defendants shall not permit, make arrangement for, acquiesce in or give support of any kind to the assignment of students to schools, individual classrooms or other school activities on the basis of race, color, or national origin, except where required to comply with constitutional standards.

(3) Defendants shall review each year all school districts in the state in which there exists schools enrolling more than 66 percent minority group students as reported in accordance with [a provision of a prior order in the action] and shall make findings as to whether or not the student assignment plans of these districts have resulted in compliance with the terms of this order . . . . Any district found not to be in compliance shall be notified that it is in violation, and, further, shall be provided in writing by the defendants with a specific detailed plan designed to eliminate all such violations of the terms of this order . . . .

(4) If, by the end of the first week of the semester or term following receipt of the notice and plan provided for in paragraph F(3), a district has failed to implement such plan, or, has failed to adopt and implement an equally effective alternate plan to eliminate all racially or ethnically identifiable schools found to be in violation of constitutional standards as provided by paragraph F(3), the defendants shall warn the district through the President of its Board of Trustees and through its Superintendent (if the district has such an official) that its accreditation is in danger. This warning shall remain in effect for ten days after which time, if the dis-

---

18. "[O]nce a case has been decided on appeal, the rule adopted is to be applied, right or wrong, absent exceptional circumstances, in the disposition of the law suit." *Schwartz v. NMS Industries, Inc.*, 575 F.2d 553, 554 (5th Cir. 1978). The law of the case doctrine "com-

prehends things decided by necessary implication as well as those decided explicitly." *Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir.), *cert. dismissed*, 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974).

trict has still failed to achieve compliance, the Texas Education Agency shall suspend the district's TEA accreditation.

(5) In addition to suspension of accreditation and simultaneously therewith defendants shall suspend payment of all state funds granted to the district under the Minimum Foundation Program for salaries, operating expenses, transportation and all other purposes.

The briefs of the parties in this case indicate some confusion about the meaning of the directives in this portion of the order, particularly the sixty–six percent figure in section F(3). In its brief, TEA states that the order

directed the Texas Education Agency to notify each school district in which there were schools enrolling more than 66 percent minority group students that the district was in violation of this court's order . . . .

*Id.* at 1, and further:

The most effective portion of this court's August 9, 1973 amended order was that portion directing the Texas Education Agency to withhold accreditation and state funds from any school district operating a campus that was over 66 percent minority students.

*Id.* at 2.

GPISD began the conclusion of its brief in the following manner:

To summarize, the TEA, in the instant case, is carrying out an order of this Federal Court directing that state funds and accreditation be denied to any school district in which there exists a school having a minority enrollment exceeding 66⅔%.

*Id.* at page 11. The order clearly did *not* comprehend an interpretation requiring TEA to take remedial action based only on the determination that a particular school in a district enrolled more than sixty–six percent minority students. The plain language of Section F(3) says that TEA "shall *review* . . . all school districts . . . in which there exists schools enrolling more than 66% minority group students . . . and shall *make*

*findings* as to *whether or not* the student assignment plans of these districts have resulted in compliance with the terms of this order." (Emphasis added.)

Accordingly, under the terms of the order, the existence of a school enrolling more than sixty–six percent minority students in a school district requires only that the TEA investigate, *inter alia*, the racial makeup of the district. The sixty–six percent figure is a triggering device, a judicial recognition that a requirement of yearly review of all school districts in the state is impracticable. After identifying a school district which contains a school enrolling more than sixty–six percent minority students, TEA is required to determine if the district is assigning students "in compliance with the terms of this order." Hence, it is only when the district is failing to comply with the order that TEA is to suspend accreditation and withhold funds.

In the area of student assignment, the standards promulgated in sections F(2) and F(4) are "the terms of this order" with which school districts and the TEA must comply. Section F(2) prohibits assignment of students on the basis of race, color, or national origin, except where required to comply with constitutional standards. The elimination of "all racially and ethnically identifiable schools" which are in violation of constitutional standards is mandated in Section F(4).

The sixty–six percent figure cannot stand as a benchmark by which to identify schools which do not comply with constitutional standards. *See Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 433–34, 96 S.Ct. 2697, 2703, 49 L.Ed.2d 599 (1976); *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280. By way of example, a school district which contained a seventy percent Mexican–American student population would not appear to be segregated simply because one of its schools had a sixty–seven percent Mexican–American student body. Similarly, those school districts which have no schools with over sixty–six percent minority students are not necessarily free from constitutional violation. To illustrate, the pres-

ence of a school district with a thirty–five percent minority student population, containing one school with only five percent minority students and another with sixty-five percent minority students, may symbolize a lack of constitutional compliance.

### B.

■ This court's prior opinions in *United States v. Texas* pronounced a condition of statewide *de jure* discrimination against Black students. It has been here found that the pattern of statewide *de jure* discrimination also harms Mexican–American students. These findings lead to a presumption that segregation of Blacks *or* Mexican–Americans in a Texas school district is the result of this *de jure* discrimination, in which case the local segregation itself is unconstitutional. The subsequent shifting of the burden of proof, brought about by the presumption, was articulated by the Supreme Court in *Keyes*: "[B]e it a statutory dual system or an allegedly unitary system where a meaningful portion of the system is found to be intentionally segregated, the existence of subsequent or other segregated schooling within the same system justifies a rule imposing on the school authorities the burden of proving that this segregated schooling is not also the result of intentionally segregative acts." 413 U.S. at 210, 93 S.Ct. at 2698.

At issue in this case is whether TEA was required to find discriminatory intent on the part of GPISD before implementing the *United States v. Texas* sanctions. Clearly, as the foregoing passage from *Keyes* demonstrates, it was not. When TEA investigates a school district under the terms of this court's orders in *United States v. Texas*, it must determine if the district contains ethnically identifiable schools.[19] As *Swann* (402 U.S. at 18, 91 S.Ct. at 1277) and *Columbus* (443 U.S. at 460, 99 S.Ct. at 2948) make clear, the presence of such schools in a *de jure* system constitutes a *prima facie* constitutional violation. If TEA determines the existence of ethnically identifiable schools, it need show nothing further to implement the sanctions provided in the *United States v. Texas* orders.

However, the school district should have the opportunity to rebut the *prima facie* case. In order to prevail, it must prove the following: (1) that its segregated condition is in no way the result of the state's intentionally segregative acts; and (2) that its segregated condition in no way results from its own intentionally segregative acts. It is entirely likely that local segregation will be the result of intentional acts by both the state and local authorities. Where the state's intentional acts have contributed to the segregation, yet the school district itself has done nothing intentionally segregative, TEA is, nevertheless, under an obligation to

19. In terms of student assignment, an ethnically identifiable school is one whose ethnic composition is substantially disproportionate to the ethnic composition of the student population for the entire district. Statistical formulae may be probative in determining ethnic identifiability.

On a case–by–case basis, the Supreme Court has relied on statistics to determine the existence of segregation in particular schools and school systems. *See Columbus*, 443 U.S. at 452, 99 S.Ct. at 2943; *Dayton II*, 443 U.S. at 529–530, 99 S.Ct. at 2975. *See also Anderson v. Dougherty County Board of Education*, 609 F.2d 225, 226 (5th Cir. 1980), where the Fifth Circuit found segregation on the basis of statistical evidence. Furthermore, the Supreme Court has sanctioned the finding of *prima facie* constitutional and statutory violations on the basis of statistics in racial discrimination cases involving grand jury selection. *Castaneda v. Partida*, 430 U.S. 482, 497 n. 17, 97 S.Ct. 1272,

1281, 51 L.Ed.2d 498 (1977), and employment practices, *Hazelwood School District v. United States*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). Thus, TEA is justified in employing any recognized statistical formulae which accurately and reliably indicates the presence of ethnically identifiable schools. Such a criterion should compare the ethnic composition of the particular school with the ethnic composition of the student population for the entire district. *See, e. g., Penick v. Columbus Board of Education*, 429 F.Supp. 229, 240, 268 (S.D.Ohio 1977), 583 F.2d 787, 799–800 (6th Cir. 1978), *aff'd*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Higgins v. Board of Education*, 508 F.2d 779, 787 n. 12 (6th Cir. 1974); *Adams v. Richardson*, 356 F.Supp. 92, 96–98 (D.D.C.1973), *aff'd in relevant part*, 480 F.2d 1159 (D.C.Cir. 1973); Taeuber and Taeuber, *Negroes in Cities*, (1965), pp. 195–245.

withdraw support for the segregated district, inasmuch as the state agency is responsible for the illegality of conditions in the district. Furthermore, the school district, as an administrative unit of the state, is necessarily implicated by and responsible for the state's acts in this connection. Where the school district alone has intentionally created segregation, without state influence, TEA is also required to withdraw its support; otherwise, it would be knowingly assisting in a continuing violation of the constitution.[20]

### C.

TEA did not misinterpret or misapply the 1973 order in relation to GPISD. In his letter to the President of the Board of Trustees of GPISD, dated November 5, 1973, the Commissioner of Education states that the 1973 Order "requires the Texas Education Agency to review all school districts in the state in which there exists one or more schools enrolling more than 66 percent minority group students and to make *findings as to whether or not* the student assignment plans have resulted in compliance with the terms of the order." (Emphasis added.) The Commissioner made the following finding in the letter:

> It is our considered opinion that the existence of Austin Elementary School, Gregory–Portland Independent School District, with a 92.37 minority student enrollment, while T. M. Clark Elementary School and East Cliff Elementary School have minority enrollment of 20.83 and 9.04 percent respectively does constitute a violation of the terms of the court order.

This finding, while perhaps not as detailed as might be desired, was based on a TEA staff report prepared after a review of GPISD. The conclusion there reached is both factually and legally correct. (See part III of this opinion.)

By failing to make explicit findings concerning the causes of the segregation at

GPISD, TEA did not violate any rights of GPISD or any provisions of the 1973 Order. Under the *Keyes* presumption (as outlined in part IIB of this opinion), the presence of segregated schools in the midst of Texas' statewide *de jure* segregation is enough to make out a *prima facie* constitutional violation. TEA's finding of segregation within GPISD was sufficient; no further inquiry into the cause of the segregation was required of the agency. Of course, a school district should have the opportunity to furnish TEA with countervailing evidence to rebut the presumption that its segregation results from a constitutional violation. It is clear that TEA did not afford GPISD a formal hearing. Whether the district had the opportunity to engage in less formal communication with TEA and present whatever offsetting evidence it may have had is not readily apparent. It does not appear from the record that GPISD attempted to proffer any evidence to TEA. In any event, the absence of an opportunity to do so would not nullify TEA's action here, as the occasion to make proof on the issues has been amply afforded GPISD in this court proceeding. It would serve no good cause, and only delay would be exalted, if this matter were now remanded to TEA for consideration of GPISD's evidence.

### D.

GPISD contends that, in this court, the burden of proof was on TEA to show discriminatory intent. This contention is incorrect. When a school district faced with a potential suspension of funding and accreditation by TEA petitions this court for relief, as GPISD has done, the burdens of proof are dictated by the *Keyes* presumption, as outlined in part IIB of this opinion. Statewide *de jure* segregation of both Black American and Mexican–Americans having been established, present segregation of either group actuates a presumption that

---

**20.** Even though TEA's funding and accreditation may in some cases be no more than a partial contribution to unconstitutional segregation, the remedy authorized by *United States v. Texas*—withdrawal of funding and accredita-

tion–is directed only toward that partial contribution. The remedy therefore is commensurate to the scope of the violation. *Milliken v. Bradley (Milliken I)*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

such segregation is linked to discriminatory intent. Therefore, when a school district comes before this court to complain of imminent TEA sanctions, TEA need only prove the existence of segregation in the district. The burden then falls on the district to show that the segregation is not the product of unconstitutional actions. Specifically, it must prove to this court: (1) that its segregated condition is in no way the result of the state's intentionally segregative acts, and (2) that to no extent was its segregated condition the result of its own intentionally segregative acts.[21] Unless both are proved by the school board, the court will find the existence of unconstitutional segregation and uphold TEA's implementation of the sanctions of *United States v. Texas.*[22]

### III.

■ That GPISD's elementary schools are highly segregated is unquestionable.[23] Four elementary schools are situated in the district. The overall elementary school population for the district is thirty–seven percent Mexican–American and sixty–three percent white. Yet, as Appendix II indicates, in three of the four schools, one race or the other separately accounts for over eighty–five percent of the body. Tabulation of the figures in Appendix II shows that nearly seventy percent of the elementary students in GPISD now attend a school which is at least eight–five percent minority or eighty–five percent white. These statistics, including the percentages showing the overall racial composition of GPISD,

almost exactly mirror the statistics in the Columbus, Ohio, schools, where the Supreme Court found clear evidence of the existence of segregation.[24]

■ The question remaining, then, is whether GPISD adequately met its burden of showing that the segregation in the district is unlinked to intentional segregative acts. It is undeniably evident that GPISD failed in this respect. Indeed, the evidence overwhelmingly supports the conclusion that GPISD has intentionally discriminated against the Mexican–American students in the district; also, that it has not endeavored to meet the consequently–imposed obligation to eliminate all vestiges of the dual school system existent in the district.

GPISD was created by the merger of Gregory Independent School District (hereinafter "GISD") and Portland Common School District (hereinafter "PCSD") by popular election in 1950. At the time of the election, GISD encompassed an area of approximately ninety–two square miles, including the town of Gregory. PCSD covered little more than the town of Portland, approximately nine square miles in extent. At the time of consolidation, the enrollment in GISD was sixty–eight percent Mexican–American. PCSD had thirty–seven percent Mexican--American students. After consolidation GPISD had fifty–eight percent Mexican--American students.[25] This past school year (1979-1980), thirty–four percent of all students and thirty–seven percent of the elementary school students in GPISD were Mexican–Americans. The ethnic dis-

---

21. See text accompanying note 20, *supra.*

22. An individual school district, upon petitioning the court for relief, would be a party to the litigation. Hence, the court may, in the exercise of its equitable power, consider remedies alternative or additional to the cessation of accreditation and funding to correct unconstitutional segregation.

23. GPISD has only one high school and one junior high school, each of which, respectively, includes all of the high school and junior high students in the district. Therefore, no constitutional violations are implicated with respect to their racial composition.

24. *Columbus,* 443 U.S. at 452, 99 S.Ct. at 2943: "In 1976, over 32% of the 96,000 students in the system were black. About 70% of all students attended schools that were at least 80% black or 80% white."

25. The circumstances do not indicate an intent to integrate the white students in PCSD with the Mexican–American students in GCSD. Indeed, it is wholly apparent from the evidence that PCSD officials desired the consolidation, only because PCSD would thereby share in substantial tax revenues, which would be derived from a tax base created by the then–imminent construction of a huge Reynolds Aluminum Company plant in GCSD.

tribution of the students in GPISD from 1949 to the present is set forth in Appendix II.

At the time of consolidation, GISD had both an elementary school and a high school on one campus, serving grades one through twelve. At that time, PCSD operated only an elementary school serving students in grades one through seven. Students in PCSD attended the eighth grade and high school in either Gregory, Taft, or Corpus Christi. In the year of consolidation, the 1950–1951 school year, no changes occurred in the operations of the schools. The first year of the joint operations began in September 1951. By the time of the 1953–1954 school year, two new elementary schools were opened in GPSD to replace the old Gregory and Portland elementary schools: Austin Elementary School in Gregory and Clark Elementary School in Portland. Both Austin Elementary and Clark Elementary School opened as ethnically identifiable schools, with minority enrollments substantially disproportionate to the overall ethnic composition of the school district. (See Appendix II).

For many years prior to 1949, both GISD and PCSD operated segregated elementary schools for Mexican–American students. These schools were called "Mexican schools", or "little Mexican Schools". For a period of time, GISD operated two Mexican schools, one in Gregory and one in Rincon. Government Exhibit 12, reproduced in full as Appendix III, accurately reflects the enrollment in the Gregory and Portland elementary and Mexican schools for the years listed. The only Anglo students ever enrolled in the Gregory Mexican school were three gypsy children, who passed through town with a traveling carnival and attended the school for fourteen days during the 1949–1950 school year. Operation of these Mexican schools was terminated after the 1949–1950 school year, only because of a directive of the State Superintendent of Education which was based on the decision in *Delgado v. Bastrop School District*.

## Classroom Assignment

Termination of the operation of the "Mexican schools" was little more than technical compliance with the directive of the State Superintendent of Education. Effective segregation of Mexican–American elementary school students, through assignment of students to segregated classrooms, continued to be practiced by GISD and PCSD during the 1950–1951 school year, and by GPISD thereafter. (See Appendices I and III). For more than a decade and a half after consolidation, with a few exceptions, all Anglo elementary school students at Austin Elementary School were assigned to one section of each grade. While a few Mexican–American students were assigned to that same section, the vast majority of Mexican–American students were assigned to other sections and taught in wholly segregated classrooms. Several former Austin Elementary School students testified that for at least some part of their elementary school education, their classrooms had no Anglo students. Likewise, one former Austin Elementary School student testified that she did not recall ever having been in a class with an Anglo student.

By its evidence, the school district attempted to explain the classroom assignments as ability groupings. Nonetheless, the district administered no tests to students before designating their individual classrooms; moreover, all such assignments were wholly subjective and discretionary on the part of the principal and teachers. Hence, the policy does not appear as a serious effort at scholastic classification, but as a pretext allowing GPISD intentionally to separate the Anglo students from the greater part of the Mexican–American students, thereby continuing the segregation previously achieved with the "Mexican schools."

Even if GPISD's so-called "ability grouping" were not masking intentional segregation, the highly segregatory result it achieved condemns the procedure employed to unconstitutionality. The presence of the intentionally segregated "Mexican schools"

in the late 1940's saddled GPISD with a subsequent burden to eliminate all vestiges of that segregation. As the Supreme Court said in *Keyes*, the fact that intentional actions, such as the maintenance of the "Mexican schools", occurred prior to the 1954 *Brown* decision does not relieve a school district of the duty to take corrective measures. 413 U.S. at 210–211, 93 S.Ct. at 2698. Once the duty is imposed, the school district's fulfillment or lack thereof is measured by "the effectiveness, not the purpose, of the actions in decreasing or increasing the segregation caused by the dual system." *Dayton II*, 443 U.S. at 538, 99 S.Ct. at 2979. Although ability grouping in and of itself is not constitutionally impermissible, a school district with a history of racial discrimination must demonstrate that such groupings are not based on the present results of past segregation. *United States v. Gadsden County School District*, 572 F.2d 1049 (5th Cir. 1978); *Morales v. Shannon*, 516 F.2d 411 (5th Cir. 1975); *McNeal v. Tate County School District*, 508 F.2d 1017 (5th Cir. 1975). GPISD, unable to point to any objective criteria for the classroom assignments under this policy, has not made such a demonstration. In point of fact, the immediate transition of Mexican–American students from the "Mexican schools" to highly segregated classrooms constituted a district manifestation that the so–called "ability groupings" were the result of prior segregation.

### School Attendance Zones

In September 1951, following consolidation, the GPISD school board voted to assign elementary students to schools according to the old district lines. It followed that all elementary school students living within the area of the old GISD were assigned to the elementary school in Gregory, and all residing in the former PCSD were assigned to the one in Portland. All high school students were enrolled in the district high school, then in Gregory. This assignment pattern established a predominantly Mexican–American elementary school in Gregory (seventy–nine percent Mexican–American), and a predominantly Anglo elementary school in Portland (thirty–one percent Mexican–American). The segregated assignment of students to schools, so accomplished, has never changed. (See Appendix II).

The new elementary schools that opened in the 1953–1954 school year, Austin and Clark, replaced the old Gregory and Portland elementary schools. The former segregated pattern of school assignment was maintained; all elementary students living within the old GISD were assigned to Austin, and all within the old PCSD were assigned to Clark. Contemporary with its occupation, Austin Elementary School became overcrowded: 674 students were crowded into sixteen classrooms, with an average class size of forty–two students. The concomitant average class size at Clark was only twenty–seven, with 317 students in twelve classrooms. Despite the evident disparity, the attendance zone line was not adjusted by the school board so as to equalize the overcrowded situation at the Austin Elementary School. By 1959, the enrollment at Austin Elementary School had dropped to the extent that it had excess capacity, whereas, in the same interval, Clark Elementary School had become overcrowded. Ignoring this imbalance, the school board did not alter the attendance zones, although it would have been an appropriate means of utilizing the excess space at Austin. Instead, two portable classrooms were installed at Clark.

After Austin and Clark were built, two new elementary schools were erected in GPISD. Both were constructed in Portland, where most of the population growth in the district has occurred. The attendance zones for both schools were carved out of the former attendance zone for Clark. Again, although it would have served to relieve the extent of segregation in GPISD's elementary schools, the school board made no change in the attendance zones separating Austin Elementary School from the remainder of the elementary schools in the district. In 1962, the East Cliff Elementary School opened with only thirteen percent Mexican–American stu-

dents. That same year, fifty–four percent of the elementary school students in the entire GPISD were Mexican–American; seventy–nine percent of them attended the Austin Elementary School, whose enrollment was eighty–four percent Mexican–American. In 1979, the Andrews Elementary School opened, only thirteen percent of the students being Mexican–American. Andrews Elementary School, as initially constructed, had the capacity to hold only 384 students. Within a very short time, its student population was in excess of that capacity. At the same time, Austin Elementary School had more than enough excess capacity to accommodate the students who could not be accommodated in Andrews Elementary School. Once more disregarding the inexpedience of their action, the school board caused the building of portable classrooms on the Andrews campus to serve the supernumerary students. Contemporaneously, most of the students attending Andrews Elementary School were being transported by bus because of dangerous conditions existing on the access road to Andrews Elementary School.

This dogged adherence to the school attendance boundary between the former districts has insured that each elementary school in GPISD opens as and remains an ethnically identifiable school. The initial establishment of the boundary line, in September of 1951, came on the heels of the closing of the "Mexican schools" and appears to have been motivated by a desire to continue, albeit more subtly, the segregation accomplished by the "Mexican schools." The intentional motivation is apparent in that, when faced with various cross–over options to relieve overcrowding in the schools, GPISD steadfastly maintained the boundary line. In terms of student population placement, GPISD abandoned common–sense solutions in favor of a policy which maintained and reinforced segregation.

In an effort to explain this segregation in the elementary schools, GPISD invokes its neighborhood school policy. However, here, as in *Morales v. Shannon*, "[t]he imposition of a neighborhood assignment system froze the Mexican–American students into [certain] schools. There could have been no other result and this is strong evidence of segregatory intent." 516 F.2d at 413.

Furthermore, it is indisputable that creation and maintenance of the boundary line had the natural and foreseeable consequence of isolating that majority of Mexican-American elementary students at Austin Elementary School. "[A]ctions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose." *Columbus*, 443 U.S. at 464, 99 S.Ct. at 2950. Particularly when combined with the other evidence cited in this section of the opinion, elementary school assignment in GPISD is quite indicative of discriminatory intent.

Even if no specific intent could be ascribed to establishment and preservation, of the former boundary line, GPISD as noted earlier, was under a duty both to disestablish the segregated system which evolved from the "Mexican schools" and to eliminate its effects. Yet it constantly adhered to the erstwhile boundary line, and thereby failed to alleviate both segregation and overcrowding in the elementary schools. It also built new schools in locations which obviously led to segregated student bodies in light of the boundary line maintenance. When under a duty to desegregate, a school board has the responsibility "to ensure that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual school system." *Columbus*, 443 U.S. at 460, 99 S.Ct. at 2948. This responsibility GPISD ignored. In the words of the Supreme Court, whenever GPISD reached one of the "many crossroads where the Board could either turn toward segregation or away from it." *Dayton II*, 443 U.S. at 463 n.12, 99 S.Ct. at 2949, it always turned toward segregation.

Indeed, the mere presence of the ethnically identifiable elementary schools shows a clear failure to fulfill the *Swann* obligation to abolish the effects of prior segregation from the "Mexican schools." *See Swann*,

402 U.S. at 18, 91 S.Ct. at 1277; *Columbus,* 443 U.S. at 460, 99 S.Ct. at 2948.

As previously stated, GPISD's neighborhood school policy may be indicative of segregatory intent; moreover, this program is no justification for GPISD's failure to dismantle the dual school system created by its *de jure* segregation.

> All things being equal, with no history of discrimination, it might well be desirable to assign pupils to schools nearest their homes. But all things are not equal in a system that has been deliberately constructed and maintained to enforce racial segregation. The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.

*Swann,* 402 U.S. at 28, 91 S.Ct. at 1282. "[T]he mere assertion of [a neighborhood school policy] is not dispositive where, as in this case, the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation." *Keyes,* 413 U.S. at 212, 93 S.Ct. at 2699.

Neither is the population makeup of Gregory satisfactory to relieve GPISD of its constitutional duty to eliminate segregation. "Not until all vestiges of the dual system are eradicated can demographic changes constitute legal cause for racial imbalance in the schools." *Lee v. Macon City Board of Education,* 616 F.2d 805, 810 (5th Cir. 1980).

### Assignment of Teachers

No Mexican–American teachers were employed by GPISD until the 1957–1958 school year. In keeping with the pattern of segregation of Mexican–American students by GPISD and its predecessor school districts, the first Mexican–American teacher was assigned to Austin Elementary School. For the next two years, although GPISD had as many as four Mexican–American teachers, all were assigned to Austin Elementary School. Through the 1967–1968 school year, when GPISD had as many as five Mexican–American elementary school teachers, no more than one was ever assigned to an elementary school other than Austin. For five years of the eleven years from the 1957–1958 through the 1967–1968 school years, no elementary school, aside from Austin, had any Mexican–American school teachers. Since then, and down to recent years, Mexican–American elementary school teachers have been disproportionately assigned to Austin Elementary School. The assignment of Mexican–American elementary school teachers in GPISD is summarized in Appendix IV. Given the high degree of control that school boards exercise over such matters as faculty placement, this pattern of assigning Mexican–American teachers cannot be adequately explained, except as a manifestation of the school board's intent to discriminate. *United States v. Texas Education Agency (Austin III),* 564 F.2d at 162, 173–174 and n. 19.

### Grade Assignments

GPISD also discriminated against Mexican Americans in the manner that it assigned Mexican-American school children to particular grades. Many Mexican–American school children attended a Catholic parochial school in Gregory for the early part of their elementary school education. When these students attempted to transfer from the parochial school to Austin Elementary School, they were not given full credit for their education at the parochial school and were often required to repeat a grade. Frequently, Mexican–American children transferring into GPISD from other public school districts were also denied credit for their former education and required to repeat grades. GPISD gave no adequate justification for this facially discriminatory practice, which had the effect of discouraging Mexican–American students from continuing in school through graduation.

### The "No–Spanish Rule"

As heretofore set out, the state of Texas once prohibited the speaking of Spanish in the classroom, with a threat of criminal sanctions. Tex.Penal Code Ann. art. 288 (Vernon 1925). In 1969, the "No–Spanish" statute was repealed in favor of a statute permitting bilingual education. Tex.Educ. Code Ann. § 21.109 (Vernon 1969). In keeping with the former state law, GPISD's written policies included the following statement: "English language shall be used exclusively in the teaching of all subjects except in foreign language courses exempt by law. English should be spoken in conversation while at school." Despite the 1969 change in state law, GPISD has never removed this provision from its written policies. Although GPISD officials claim that it is no longer in practical effect, the evidence demonstrates that the rule has been enforced as recently as the late 1970's. Indeed, over the years, the rule against speaking Spanish at school was repressively enforced at GPISD, elementary and high school students having received corporal and other punishments for doing so. The rule was applied not only to the classroom, but to all areas of the school campus; *e. g.*, one elementary school student received corporal punishment for asking a friend, in Spanish, to throw him a ball.

As alluded to earlier, the promulgation of this statute by the State of Texas and its continued enforcement by GPISD, even *after* statutory repeal, evinces facially discriminatory intent against Mexican–American children and produces the kind of stigma which was clearly outlawed in *Brown v. Board of Education.*

### Miscellaneous

Finally, the evidence disclosed several incidents that show ethnic discrimination. These incidents, when taken individually or in isolation, might prove little. But when considered collectively and viewed against the background of other segregatory and discriminatory treatment of Mexican–American school children in the GPISD, they become probative of GPISD's attitude toward and intent to discriminate against Mexican–Americans. First, Dean Dreiling, the President of the Board of Trustees of GPISD, once suggested to Leonel Rios, a former member of the Board of Trustees of GPISD, that Austin Elementary School need not be air conditioned because the Mexican–American children attending Austin Elementary School were not used to air conditioning in their homes. Rios objected vigorously, and Austin Elementary School was air conditioned. Second, at several school board meetings, the presiding member of the board of trustees refused to recognize Mexican–American citizens in the audience whose purpose was to ask questions or to make comments. At the same meetings, Anglo citizens were recognized and allowed to speak. Third, the Athletic Director employed by GPISD has repeatedly used ethnic epithets and directed insults toward Mexican-American students, as well as overtly discriminating against them in the athletic program at Gregory–Portland High School. No corrective action has ever been taken by the GPISD administration or the Board of Trustees as a result of the athletic director's conduct, although complaints regarding these incidents have been brought to the attention of both.

### Summary

The evidence recited in this section must be considered from three aspects. First, the GPISD policies and actions, singly and collectively, demonstrate the school district's unconstitutional and intentional discrimination against children of Hispanic heritage. Second, the school district's policies evidence a failure to eliminate the vestiges of the intentional segregation of the "Mexican school" days. Third, these policies are in many ways an extension and supplementation of the statewide *de jure* discrimination discussed in Part I of this opinion.

The segregated condition of the Gregory–Portland schools, therefore, is in violation of the Constitution and immediate relief is required.

## IV.

■ Under the terms of the August 9, 1973, Order, if TEA finds that student assignment in a district is in contravention of the Constitution, it is to notify the district of the violation and provide it with a specific detailed plan for elimination of the violations. In this civil action, four plans are before the court. The TEA initially proposed two plans, Plan A and Plan B. During the course of the trial, it withdrew Plan A. The school district proposed a plan substantially similar to Plan A. Finally, two court–appointed experts proposed a fourth plan.

Plan B is constitutional and promises effective relief from the segregation of Mexican–Americans in elementary schools in GPISD. By this plan, each elementary school is made a single attendance facility; that is, all children within the GPISD in a particular grade are required to attend one school. For example, the plan mandates that all first graders in the district will attend Austin, all second graders East Cliff, etc. (Plan B is attached as Appendix V to this opinion.) In proposing Plan B, TEA has complied with this court's order; hence, further inquiry into the other plans is unnecessary. However, to provide future guidance to TEA in its observance of the Order, and because of defendants' negative position regarding the transportation of students to dismantle the existing segregation in GPISD, the plans will be briefly analyzed.

Both Plan A and the school district plan exclude the first and second grades from any remedial action. Such plans must be disapproved, inasmuch as they do not fully correct the constitutional violation. *See, e. g., U. S. v. Texas Education Agency (Austin III); Mills v. Board of Public Instruction, Polk County, Florida,* 575 F.2d 1146 (5th Cir. 1978); *Arvizu v. Waco Independent School District,* 495 F.2d 499 (5th Cir. 1974); *Flax v. Potts,* 464 F.2d 865 (5th Cir.) *cert. denied,* 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972); *Lockett v. Board of Education of Muscogee County School District,* 447 F.2d 472 (5th Cir. 1971). The plan proposed by the court–appointed experts is also unacceptable, for it requires much more transportation of Mexican–American students than Anglo students, thereby placing an inequitably disproportionate burden of desegregation on the Mexican–American community. *See, e. g., NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1052 (6th Cir. 1977); *Arvizu v. Waco Independent School District; United States v. Texas Education Agency (Austin 1),* 467 F.2d 848 (*en banc*); *Lee v. Macon Board of Education,* 448 F.2d 746 (5th Cir. 1971); *Arthur v. Nyquist,* 473 F.Supp. 830 (W.D.N. Y.1979); *Brice v. Landis,* 314 F.Supp. 974 (N.D.Cal.1969).

The laudable manner in which TEA conducted its part in the trial of this action indicates an acceptance of its constitutional obligation [26] to eliminate the ugly spectre of racial discrimination, which has too long plagued the public schools of Texas. It has shown commendable candor in admitting the existence of unconstitutional statewide discrimination against Mexican–Americans and in joining the battle to eliminate this malign bias from all but the history books. A significant step has been taken in this case by TEA, a step in accord with the spirit of the Fourteenth Amendment's monumental guarantee of equal protection of the laws. Perhaps we are somewhat closer to the day eloquently envisioned by Judge Richard T. Rives of the Court of Appeals for the Fifth Circuit: "I look forward to the day when the State and its political subdivision will again take up their mantle of responsibility, treating all of their citizens equally, and thereby relieve the feder-

---

**26.** Of course, all parties–including the intervenors in *United States v. Texas,* the GI Forum and the League of United Latin American Citizens–are called upon to monitor the effectiveness of TEA's compliance with this order. If either TEA's own actions or the terms of the *United States v. Texas* order itself prove insuf-

ficient to carry out the constitution's mandate that racial discrimination be eliminated from the public schools "root and branch" (*Green v. County School Board,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716 (1968)), the parties may petition this court for further relief.

al Government of the necessity of intervening in their affairs." [27]

## APPENDIX I

### GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

### AUSTIN ELEMENTARY SCHOOL

#### 1953-54

| | Anglo students | Mexican-American students |
|---|---|---|
| Grade 1: | | |
| Section 1 | 14 | 23 |
| Section 2 | | 52 |
| Section 3 | | 51 |
| Grade 2: | | |
| Section 1 | 16 | 33 |
| Section 2 | | 57 |
| Section 3 | | 29* |
| Grade 3: | | |
| Section 1 | 23 | 15 |
| Section 2 | | 54 |
| Grade 4: | | |
| Section 1 | 19 | 18 |
| Section 2 | | 74* |
| Grade 5: | | |
| Section 1 | 13 | 24 |
| Section 2 | | 52 |
| Section 3 | | 28** |
| Grade 6: | 16 | 17 |
| Grade 7: | 13 | 26 |
| Grade 8: | 13 | 14 |

* The large second section of the fourth grade was composed of both second and fourth graders during the first half of the year; the third section of the second grade was created mid-year by taking the second graders out of the combined class.

** This class was designated the "Opportunity Class."

### GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

### AUSTIN ELEMENTARY SCHOOL

#### 1958-59

| | Anglo students | Mexican-American students |
|---|---|---|
| Grade 1: | | |
| Primer | | 60 (2 sections) |
| Section 1 | 16 | 18 |
| Section 2 | | 43 |
| Grade 2: | | |
| Section 1 | 23 | 15 |
| Section 2 | | 41 |
| Section 3 | | 43 |
| Grade 3: | | |
| Section 1 | 19 | 21 |
| Section 2 | 1 | 33 |
| Section 3 | | 35 |
| Grade 4: | | |
| Section 1 | 14 | 20 |
| Section 2 | | 35 |
| Section 3 | | 40 |
| Grade 5: | | |
| Section 1 | | 39 |
| Section 2 | 19 | 17 |
| Section 3 | | 40 |
| Grade 6: | | |
| Section 1 | 20 | 9 |
| Section 2 | | 32 |
| Section 3 | | 33 |
| Grade 7: | | |
| Section 1 | 12 | 21 |
| Section 2 | | 37 |
| Grade 8: | | |
| Section 1 | 14 | 12 |
| Section 2 | | 18 |

### GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

### AUSTIN ELEMENTARY SCHOOL

#### 1959-60

| | Anglo students | Mexican-American students |
|---|---|---|
| Grade 1: | | |
| Primer 1 | | 42 |
| Primer 2 | 3 | 38 |
| Section 1 | 20 | 14 |
| Section 2 | | 47 |
| Grade 2: | | |
| Section 1 | 14 | 12 |
| Section 2 | | 33 |
| Section 3 | | 38 |
| Grade 3: | | |
| Section 1 | | 42 |
| Section 2 | 24 | 8 |
| Section 3 | | 38 |
| Grade 4: | | |
| Section 1 | 14 | 20 |
| Section 2 | | 31 |
| Section 3 | | 44 |
| Grade 5: | | |
| Section 1 | 16 | 13 |
| Section 2 | | 34 |
| Section 3 | | 32 |
| Grade 6: | | |
| Section 1 | 19 | 12 |
| Section 2 | | 28 |
| Section 3 | | 37 |

27. *Dent v. Duncan*, 360 F.2d 333, 337–338 (5th Cir. 1966) (concurring opinion).

GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

AUSTIN ELEMENTARY SCHOOL

1962–63

| Grade 1: | Anglo students | Mexican-American students |
|---|---|---|
| Section 1 | 21 | 12 |
| Section 2 | | 40 |
| Section 3 | 1 | 51 |
| Section 4 | | 36 |
| Section 5 | | 33 |
| Grade 2: | | |
| Section 1 | 19 | 11 |
| Section 2 | 1 | 28 |
| Section 3 | | 45 |
| Grade 3: | | |
| Section 1 | 16 | 11 |
| Section 2 | | 30 |
| Section 3 | | 45 |
| Section 4 (Half-year) | 1 | 42 |
| Grade 4: | | |
| Section 1 | 20 | 6 |
| Section 2 | | 29 |
| Section 3 | 1 | 32 |
| Grade 5: | | |
| Section 1 | 9 | 16 |
| Section 2 | | 26 |
| Section 3 | | 32 |
| Grade 6: | | |
| Section 1 | 19 | 7 |
| Section 2 | | 32 |
| Section 3 | | 41 |

GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

AUSTIN ELEMENTARY SCHOOL

1963–64

| Grade 1: | Anglo students | Mexican-American students |
|---|---|---|
| Section 1 | 17 | 11 |
| Section 2 | | 38 |
| Section 3 | | 38 |
| Section 4 | | 32 |
| Section 5 | | 32 |
| Grade 2: | | |
| Section 1 | 17 | 13 |
| Section 2 | | 35 |
| Section 3 | | 45 |

| | Anglo students | Mexican-American students |
|---|---|---|
| Grade 3: | | |
| Section 1 | 18 | 11 |
| Section 2 | | 31 |
| Section 3 | | 43 |
| Section 4 | | 24 |
| Grade 4: | | |
| Section 1 | 13 | 18 |
| Section 2 | | 35 |
| Section 3 | | 43 |
| Grade 5: | | |
| Section 1 | 17 | 8 |
| Section 2 | | 30 |
| Section 3 | | 41 |
| Grade 6: | | |
| Section 1 | 5 | 25 |
| Section 2 | | 30 |
| Section 3 | | 11* |

---

* This class was designated the "opportunity class."

GREGORY PORTLAND I.S.D. CLASSROOM ASSIGNMENTS

AUSTIN ELEMENTARY SCHOOL

1965–66

| Grade 1: | Anglo students | Mexican-American students |
|---|---|---|
| Section 1 | 19 | 11 |
| Section 2 | | 33 |
| Section 3 | | 37 |
| Section 4 | | 38 |
| Grade 2: | | |
| Section 1 | 17 | 15 |
| Section 2 | | 27 |
| Section 3 | | 30 |
| Grade 3: | | |
| Section 1 | 13 | 16 |
| Section 2 | | 27 |
| Section 3 | | 33 |
| Section 4 | | 28 |
| Grade 4: | | |
| Section 1 | 13 | 13 |
| Section 2 | | 25 |
| Section 3 | | 28 |
| Grade 5: | | |
| Section 1 | 19 | 12 |
| Section 2 | | 32 |
| Section 3 | | 29 |
| Grade 6: | | |
| Section 1 | 14 | 15 |
| Section 2 | | 29 |
| Section 3 | | 28 |

## APPENDIX II

### ETHNIC DISTRIBUTION

| | | Enrolled | | % | |
|---|---|---|---|---|---|
| | Total | Ethnic Minority | Other | Ethnic Minority | Other |
| **1949 50 (Year before consolidation)** | | | | | |
| Portland I.S.D. (1 7) | 249 | 91 | 158 | 37 | 63 |
| Gregory I.S.D. (1 12) | 496 | 339 | 157 | 68 | 32 |
| Gregory Elem. (1 8) | 431 | 326 | 105 | 76 | 24 |
| Gregory High School (9–12) | 65 | 13 | 52 | 20 | 80 |
| **1950 51 (Year of consolidation)** | | | | | |
| G P C.I.S.D. (1 12) | 878 | 507 | 371 | 58 | 42 |
| Gregory Elem. (1 8) | 485 | 382 | 103 | 79 | 21 |
| Portland Elem. (1 7) | 307 | 95 | 212 | 31 | 69 |
| G P High School (9–12) | 86 | 30 | 56 | 35 | 65 |
| **1953 54 (Moved into Austin & Clark)** | | | | | |
| G P C.I.S.D. (1 12) | 1084 | 716 | 368 | 66 | 34 |
| Austin (1 8) | 674 | 573 | 101 | 85 | 15 |
| Clark (1 8) | 319 | 120 | 199 | 38 | 62 |
| G P High School (9 12) | 91 | 23 | 68 | 25 | 75 |
| **1958 59 (Year prior to Jr. High)** | | | | | |
| G P C.I.S.D. (1 12) | 1634 | 931 | 708 | 57 | 43 |
| Austin (1 8) | 799 | 652 | 147 | 82 | 18 |
| Clark (1–8) | 588 | 182 | 406 | 31 | 69 |
| G P High School (9 12) | 247 | 97 | 150 | 39 | 61 |
| **1959 60 (Open Jr. Hi on Clark Campus)** | | | | | |
| G P I.S.D. (1 12) | 1710 | 962 | 748 | 56 | 44 |
| Austin (1 6) | 684 | 562 | 122 | 82 | 18 |
| Clark (1 6) | 532 | 176 | 356 | 33 | 67 |
| G P Jr. High School | 271 | 147 | 124 | 54 | 46 |
| G P High School | 223 | 77 | 146 | 35 | 65 |
| **1962 63 (Moved into East Cliff)** | | | | | |
| G P I.S.D. | 2113 | 1051 | 1062 | 50 | 50 |
| Austin (1 6) | 729 | 615 | 114 | 84 | 16 |
| Clark (1 6) | 493 | 138 | 355 | 28 | 72 |
| East Cliff (1 4) | 221 | 29 | 192 | 13 | 87 |
| G P Jr. High School (7 8) | 290 | 118 | 172 | 41 | 59 |
| G P High School (9 12) | 380 | 151 | 229 | 40 | 60 |
| **1964 65 (Year prior to new High School)** | | | | | |
| G P I.S.D. | 2515 | 1038 | 1477 | 41 | 59 |
| Austin (1 6) | 666 | 549 | 117 | 82 | 18 |
| Clark (1 6) | 555 | 130 | 425 | 23 | 77 |
| East Cliff (1 6) | 427 | 31 | 396 | 7 | 93 |
| G P Jr. High School (7–8) | 376 | 160 | 216 | 43 | 57 |
| G P High School (9 12) | 491 | 168 | 323 | 34 | 66 |
| **1965 66 (Moved into new High School)** | | | | | |
| G P I.S.D. | 2777 | 1062 | 1715 | 38 | 62 |
| Austin (1 6) | 637 | 528 | 109 | 83 | 17 |
| Clark (1 6) | 659 | 146 | 513 | 22 | 78 |
| East Cliff (1 6) | 460 | 31 | 429 | 7 | 93 |
| G P Jr. High (Clark) (7) Portland | 247 | 85 | 162 | 34 | 66 |
| G P Jr. High (Old H.S.) (8) Gregory | 193 | 69 | 124 | 36 | 64 |
| G P High School (9–12) | 581 | 203 | 378 | 35 | 65 |

| | | Enrolled | | % | |
|---|---|---|---|---|---|
| **1968 -69 (Moved into new Jr. Hi -H.E.W. Report)** | Total | Ethnic Minority | Other | Ethnic Minority | Other |
| G P I.S.D. | 3012 | 979 | 2033 | 33 | 67 |
| Austin | 484 | 398 | 86 | 82 | 18 |
| Clark | 667 | 128 | 539 | 19 | 81 |
| East Cliff | 531 | 34 | 497 | 6 | 94 |
| G P Jr. High School | 539 | 194 | 345 | 36 | 64 |
| G P High School | ·791 | 225 | 566 | 28 | 72 |
| **1969 70 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3254 | 1105 | 2149 | 34 | 66 |
| Austin | 555 | 484 | 71 | 87 | 13 |
| Clark | 700 | 131 | 569 | 19 | 81 |
| East Cliff | 552 | 42 | 510 | 8 | 92 |
| G P Jr. High School | 616 | 217 | 399 | 35 | 65 |
| G P High School | 831 | 231 | 600 | 28 | 72 |
| **1970 71 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3351 | 1163 | 2188 | 35 | 65 |
| Austin | 590 | 527 | 63 | 89 | 11 |
| Clark | 696 | 133 | 563 | 19 | 81 |
| East Cliff | 528 | 46 | 482 | 9 | 91 |
| G P Jr. High School | 596 | 179 | 417 | 30 | 70 |
| G P High School | 942 | 278 | 664 | 30 | 70 |
| **1971 72 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3553 | 1285 | 2268 | 36 | 64 |
| Austin | 648 | 590 | 58 | 91 | 9 |
| Clark | 715 | 161 | 554 | 23 | 77 |
| East Cliff | 527 | 43 | 484 | 8 | 92 |
| G P Jr. High School | 603 | 179 | 424 | 30 | 70 |
| G P High School | 1060 | 312 | 748 | 29 | 71 |
| **1972 73 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3605 | 1278 | 2327 | 35 | 65 |
| Austin | 646 | 593 | 53 | 92 | 8 |
| Clark | 702 | 140 | 562 | 20 | 80 |
| East Cliff | 550 | 43 | 507 | 8 | 92 |
| G P Jr. High School | 618 | 193 | 425 | 31 | 69 |
| G P High School | 1089 | 309 | 780 | 28 | 72 |
| **1973 74 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3656 | 1298 | 2358 | 36 | 64 |
| Austin | 629 | 581 | 48 | 92 | 8 |
| Clark | 749 | 156 | 593 | 21 | 79 |
| East Cliff | 558 | 50 | 508 | 8 | 91 |
| G P Jr. High School | 633 | 205 | 428 | 32 | 68 |
| G P High School | 1087 | 305 | 782 | 28 | 72 |
| **1974 75 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3666 | 1241 | 2425 | 34 | 66 |
| Austin | 620 | 568 | 52 | 92 | 8 |
| Clark | 748 | 165 | 583 | 22 | 78 |
| East Cliff | 573 | 62 | 511 | 11 | 89 |
| G P Jr. High School | 613 | 179 | 434 | 29 | 71 |
| G P High School | 1112 | 267 | 845 | 24 | 76 |
| **1975· 76 (H.E.W. Report)** | | | | | |
| G P I.S.D. | 3807 | 1306 | 2501 | 34 | 66 |
| Austin | 619 | 550 | 69 | 89 | 11 |
| Clark | 848 | 183 | 665 | 22 | 78 |
| East Cliff | 577 | 72 | 505 | 12 | 88 |
| G P Jr. High School | 618 | 190 | 428 | 31 | 69 |
| G- P High School | 1145 | 311 | 834 | 27 | 73 |

| | | Enrolled | | % | |
|---|---|---|---|---|---|
| | Total | Ethnic Minority | Other | Ethnic Minority | Other |
| **1976-77 (H.E.W. Report)** | | | | | |
| G-P I.S.D. | 3819 | 1338 | 2481 | 35 | 65 |
| Austin | 578 | 519 | 59 | 90 | 10 |
| Clark | 885 | 200 | 685 | 23 | 77 |
| East Cliff | 556 | 78 | 478 | 14 | 86 |
| G P Jr. High School | 685 | 226 | 459 | 33 | 67 |
| G P High School | 1115 | 315 | 800 | 28 | 72 |
| **1977-78 (Fall Survey Package)** | | | | | |
| G-P I.S.D. | 3936 | 1380 | 2556 | 35 | 65 |
| Austin | 547 | 491 | 56 | 90 | 10 |
| Clark | 941 | 244 | 697 | 26 | 74 |
| East Cliff | 583 | 78 | 505 | 13 | 87 |
| G P Jr. High School | 696 | 224 | 472 | 32 | 68 |
| G P High School | 1169 | 343 | 826 | 29 | 71 |
| **1978-79 (Fall Survey Package)** | | | | | |
| G-P I.S.D. | 4185 | 1432 | 2753 | 34 | 66 |
| Austin | 554 | 499 | 55 | 90 | 10 |
| Clark | 1118 | 266 | 852 | 24 | 76 |
| East Cliff | 600 | 81 | 519 | 14 | 86 |
| G P Jr. High School | 668 | 233 | 435 | 35 | 65 |
| G P High School | 1245 | 353 | 892 | 28 | 72 |
| **1979-80 (Opened New Elementary W. C. Andrews Elem.)** | | | | | |
| G-P I.S.D. | 4361 | 1494 | 2867 | 34 | 66 |
| Austin | 538 | 508 | 30 | 94 | 6 |
| Andrews | 491 | 65 | 426 | 13 | 87 |
| Clark | 716 | 200 | 516 | 28 | 72 |
| East Cliff | 608 | 86 | 522 | 14 | 86 |
| G P Jr. High School | 695 | 232 | 463 | 33 | 67 |
| G-P High School | 1313 | 403 | 910 | 31 | 69 |

## APPENDIX III

### GREGORY INDEPENDENT SCHOOL DISTRICT

#### STUDENT ENROLLMENT

1938–39

(based on official teacher registers)

| Gregory School | Anglo students | Mexican-American students |
|---|---|---|
| Grade: 1 | 37 | |
| 2 | 46 | |
| 3 | 43 | |
| 4 | 25 | |
| 5 | 26 | |
| 6 | 33 | 3 |
| 7 | 18 | |
| 8 | 31 | |
| 9 | 10 | |
| 10 | 26 | |
| 11 | 10 | |

| | Anglo students | Mexican-American students |
|---|---|---|
| **Gregory Mexican School** | | |
| Grade: 1 | | 88 |
| 2 5 | | 41 |
| **Rincon Mexican School** | | |
| Grades 1 7 | | 30 |

### GREGORY INDEPENDENT SCHOOL DISTRICT

#### STUDENT ENROLLMENT

1944–45

(based on official teacher registers)

| | Anglo students | Mexican-American students |
|---|---|---|
| **Gregory School** | | |
| Grade: 1 (Register missing) | | |
| 2 | 30 | |
| 3 | 9 | |

| | Anglo students | Mexican-American students |
|---|---|---|
| **Gregory School** | | |
| Grade: 4 | 19 | 11 |
| 5–6 | 18 | 11 |
| 7 | 15 | 3 |
| 8 | 27 | 2 |
| 9 | 17 | 2 |
| 10 | 16 | |
| 11 | 15 | 1 |
| **Gregory Mexican School** | | |
| Grade: 1 | | 99 |
| 2 | | 17 |
| 3 | | 26 |

## GREGORY INDEPENDENT SCHOOL DISTRICT

### STUDENT ENROLLMENT

#### 1949–50

(based on official teacher registers)

| | Anglo students | Mexican-American students |
|---|---|---|
| **Gregory School** | | |
| Grade: 1 | 15 | 12 |
| 1-2 (one teacher) | | 88 |
| 2 | 11 | 27 |
| 3 | 6 | 32 |
| 4 | 14 | 19 |
| 5 | 12 | 18 |
| 6 | 16 | 18 |
| 7 | 14 | 8 |
| 8 | 12 | 9 |
| 9 | 19 | 7 |
| 10 | 10 | 4 |
| 11 | 10 | 1 |
| 12 | 13 | 1 |
| **Gregory Latin-American School** | | |
| Grade: 1 | 3* | 90 |

---

* A note indicates that these three students were gypsies passing through with a carnival, and only attended school for fourteen days.

## PORTLAND COMMON SCHOOL DISTRICT

### STUDENT ENROLLMENT

#### 1949–50

(based on official teacher registers)

| | Anglo students | Mexican-American students |
|---|---|---|
| **Portland School** | | |
| Grade: Pre-first | | 32 |
| 1 | 36 | |
| 2 | 25 | 13 |
| 3 | 25 | 10 |
| 4 | 30 | 7 |
| 5 | 17 | 13 |
| 6 | 16 | 11 |
| 7 | 14 | 4 |

### STUDENT ENROLLMENTS IN THE YEAR OF CONSOLIDATION

#### 1950–51

(based on official teacher registers)

## GREGORY INDEPENDENT SCHOOL DISTRICT

| | Anglo students | Mexican-American students |
|---|---|---|
| **Gregory School** | | |
| Grade: 1 1 ("Latin American") | | 87 |
| 1 2 | 13 | 28 |
| 2 1 | | 78 |
| 2 2 | 13 | 35 |
| 3 | 10 | 44 |
| 4 | 7 | 41 |
| 5 | 12 | 33 |
| 6 | 11 | 17 |
| 7 | 16 | 11 |
| 8 | 20 | 6 |
| 9 | 17 | 23 |
| 10 | 21 | 3 |
| 11 (Register missing) | | |
| 12 | 18 | 4 |

## PORTLAND COMMON SCHOOL DISTRICT

| | Anglo students | Mexican-American students |
|---|---|---|
| **Portland School** | | |
| Grade: 1–1 | | 29 |
| 1–2 | 29 | 7 |
| 2 | 34 | 8 |
| 3 | 39 | 18 |
| 4 | 39 | 8 |
| 5 | 24 | 4 |
| 6 | 25 | 11 |
| 7 | 21 | 11 |

## APPENDIX IV

### GREGORY–PORTLAND INDEPENDENT SCHOOL DISTRICT MEXICAN–AMERICAN ELEMENTARY TEACHERS

| | Austin | Clark | East Cliff | Andrews |
|---|---|---|---|---|
| 1957-58 | 1 | | | |
| 1958-59 | 3 | | | |
| 1959-60 | 4 | | | |
| 1960-61 | 3 | 1 | | |
| 1961-62 | 3 | 1 | | |
| 1962-63 | 2 | | | |
| 1963-64 | 1 | | | |
| 1964-65 | 3 | | | 1 |
| 1965-66 | 2 | 1 | | |
| 1966-67 | 2 | 1 | | |
| 1967-68 | 4 | 1 | | |
| 1968-69 | 4 | 2 | | |
| 1969-70 | 4 | 2 | | |
| 1970-71 | 4 | 1 | 1 | |
| 1971-72 | 3 | 1 | 2 | |
| 1972-73 | 4 | 2 | 2 | |
| 1973-74 | 4 | 3 | 3 | |
| 1974-75 | 6 | 4 | 3 | |
| 1975-76 | 8 | 5 | 3 | |
| 1976-77 | 9 | 6 | 5 | |
| 1977-78 | 10 | 7 | 5 | |
| 1978-79 | 11 | 12 | 7 | |
| 1979-80 | 11 | 6 | 8 | 4 |

## APPENDIX V

### Plan B

The following desegregation plan is submitted as a possibility for the elimination of racially isolated schools in the Gregory-Portland Independent School Distrlct. This plan would totally integrate the district, making all schools single attendance facilities at all grade levels.

The results of the plan would be as follows:

| | Other Min. | Black | Hisp. | Caucasian | Total | % Min. |
|---|---|---|---|---|---|---|
| Austin (Cap. 682) PreK, K, & 1 | 1 | 1 | 228 | 359 | 589 | |
| | 0.2% | 0.2% | 38.7% | 60.9% | | 39.0% |
| East Cliff (Cap. 620) 2 & 3 | 6 | 1 | 268 | 433 | 708 | |
| | 0.8% | 0.1% | 37.8% | 61.2% | | 38.8% |
| Andrews (Cap. 432) 4 | 3 | 0 | 128 | 250 | 381 | |
| | 0.8% | | 33.6% | 65.6% | | 34.4% |
| Clark (Cap. 784) 5 & 6 | 3 | 3 | 238 | 454 | 698 | |
| | 0.4% | 0.4% | 34.1% | 64.1% | | 35.9% |
| District Totals | 13 | 5 | 862 | 1,496 | 2,376 | |
| | 0.5% | 0.2% | 36.3% | 63.0% | | 37.0% |

The projected enrollment of the East Cliff school, housing grades 2 and 3, would be 88 students over the stated capacity of the facility. This would necessitate moving perhaps three portable buildings to the East Cliff site. As the capacity of all other elementary schools is underutilized, portables from these schools could be used at a minimum cost to the district.

The plan will necessitate student movement. The following chart shows how many students from each grade level will be moved from their presently assigned school to another.

| From: | Grade: | To: | No. of Students: | Distance (Miles): |
|---|---|---|---|---|
| Austin | 3 | East Cliff | 82 | 4.2 |
| | 4 | Andrews | 85 | 4.4 |
| | 5 | Clark | 62 | 3.5 |
| | 6 | Clark | 70 | 3.5 |
| East Cliff | K | Austin | 52 | 4.2 |
| | 1 | Austin | 65 | 4.2 |
| | 4 | Andrews | 106 | 2.2 |
| | 5 | Clark | 114 | 1.2 |
| | 6 | Clark | 94 | 1.2 |
| Andrews | K | Austin | 49 | 4.4 |
| | 1 | Austin | 77 | 4.4 |
| | 2 | East Cliff | 75 | 2.2 |
| | 3 | East Cliff | 75 | 2.2 |
| | 5 | Clark | 62 | 1.3 |
| | 6 | Clark | 69 | 1.3 |

| From: | Grade: | To: | No. of Students: | Distance (Miles): |
|---|---|---|---|---|
| Clark | K | Austin | 80 | 3.5 |
| | 1 | Austin | 107 | 3.5 |
| | 2 | East Cliff | 99 | 1.2 |
| | 3 | East Cliff | 120 | 1.2 |
| | 4 | Andrews | 106 | 1.3 |
| | | Total students moved | 1,649 | |

NOTE: All students moved will not necessarily require transportation.